No. 824. WILLIAMS ET AL. *v.* SHAFFER. Sup. Ct. Ga. Certiorari denied. *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston* and *Howard Moore, Jr.,* for petitioners. *Arthur K. Bolton,* Attorney General of Georgia, and *Harold N. Hill, Jr.,* and *Alfred L. Evans, Jr.,* Assistant Attorneys General, for respondent.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE concurs, dissenting.

This case involves an important question regarding the right of a poor tenant to remain in possession of his shelter and defend against eviction in a court of law. It is part of the larger problem regarding the inability of indigent and deprived persons to voice their complaints through the existing institutional framework, and vividly demonstrates the disparity between the access of the affluent to the judicial machinery and that of the poor in violation of the Equal Protection Clause.

The Georgia summary eviction statute provides that a landlord may oust a tenant in a very swift, expedient manner. The landlord files with a judge of the superior court or justice of the peace an affidavit that the tenant has held over or has failed to pay rent (Ga. Code Ann. § 61–301 (1966)); and the judge issues a dispossessory warrant ordering the sheriff to evict the tenant and his possessions. Ga. Code Ann. § 61–302 (1966). The tenant may arrest the proceedings and prevent his summary eviction by filing a counter-affidavit denying the landlord's allegations (Ga. Code Ann. § 61–303 (1966)) and thereby obtain a jury trial on the facts in issue. Ga. Code Ann. § 61–304 (1966). But in order to remain in possession and obtain a trial (see Ga. Code Ann. § 61–304 (1966)) the tenant must "tender a bond with good security, payable to the landlord, for the payment of such sum, with costs, as may be recovered against him on the

trial of the case." [1]   Ga. Code Ann. § 61–303 (1966).   If the tenant is not able to furnish the security bond, he is summarily evicted.   The effect is that the indigent tenant is deprived of his shelter, and the life of his family is disrupted—all without a hearing—solely because of his poverty.

In this case, respondent, petitioners' landlord, obtained a dispossessory warrant after filing an affidavit that petitioners had failed to pay the rent.   Petitioners attempted to file counter-affidavits raising a number of defenses, together with affidavits that they were unable to post security due to their indigency.   Apparently the affidavits were rejected.   Petitioners then petitioned the Superior Court attempting to arrest the summary eviction.   They sought vacation of the dispossessory warrants and injunctions against the landlord and the sheriff restraining them from executing the warrants.   Each petitioner offered to pay into the court registry any rents due or to become due during the pendency of the action.   Their petitions were denied and the action dismissed.   Thereafter, petitioners were summarily evicted.   On appeal, the Georgia Supreme Court held that the case was moot because petitioners had been evicted.

The State, acting on the landlord's behalf, argues that certiorari should be denied on that ground.   Whether

---

[1] The security required is substantial.   Ga. Code Ann. § 61–305 (1966) provides:

"If the issue specified in [§ 61–304] shall be determined against the tenant, judgment shall go against him for double the rent reserved or stipulated to be paid . . . and such judgment in any case shall also provide for the payment of future double rent until the tenant surrenders possession of the lands or tenements to the landlord after an appeal or otherwise . . . ."

The insurance companies which posted dispossessory bonds informed petitioners that it would be necessary for each petitioner to put up a cash collateral for double the rent for about six months, as well as pay a bond premium.

or not a case is moot is a federal question which must be resolved by this Court. The finding of mootness by the State Supreme Court is not binding on us. See *Ward* v. *Love County,* 253 U. S. 17, 22; *Love* v. *Griffith,* 266 U. S. 32, 33–44; *Liner* v. *Jafco, Inc.,* 375 U. S. 301. The mootness doctrine is a beneficial one, expressive of the need for adverse parties who will vigorously argue the conflicting contentions to the Court and a necessary one in light of the requirements of Article III. But if this case were held to be moot, no tenant would ever be able to bring the statute to this Court. His eviction would render the case moot and preclude a challenge to the very statute causing the eviction. The statute would be immune from the constitutional challenge. Perhaps I am wrong. But the point is so substantial as to require oral argument.

The effect of the security statute is to grant an affluent tenant a hearing and to deny an indigent tenant a hearing. The ability to obtain a hearing is thus made to turn upon the tenant's wealth. On numerous occasions this Court has struck down financial limitations on the ability to obtain judicial review. See, *e. g., Griffin* v. *Illinois,* 351 U. S. 12; *Burns* v. *Ohio,* 360 U. S. 252; *Smith* v. *Bennett,* 365 U. S. 708. We have recognized that the promise of equal justice for all would be an empty phrase for the poor if the ability to obtain judicial relief were made to turn on the length of a person's purse. It is true that these cases have dealt with criminal proceedings. But the Equal Protection Clause of the Fourteenth Amendment is not limited to criminal prosecutions. Its protections extend as well to civil matters. I can see no more justification for denying an indigent a hearing in an eviction proceeding solely because of his poverty than for denying an indigent the right to appeal (*Burns* v. *Ohio, supra*), the right to file a habeas corpus petition (*Smith* v. *Ben-*

*nett, supra*), or the right to obtain a transcript necessary for appeal (*Griffin* v. *Illinois, supra*).

It is no answer to say that the Georgia procedure is fairer than the procedures of some States, whereby a tenant can be evicted without any opportunity for a hearing. Though a State may not constitutionally be required to afford a hearing before its process is used to evict a tenant, having provided one it cannot discriminate between rich and poor. It cannot consistently with the Equal Protection Clause provide a hearing in such a way as to discriminate against some "on account of their poverty." *Griffin* v. *Illinois, supra,* at 18.

The problem of housing for the poor is one of the most acute facing the Nation. The poor are relegated to ghettos and are beset by substandard housing at exorbitant rents. Because of their lack of bargaining power, the poor are made to accept onerous lease terms. Summary eviction proceedings are the order of the day. Default judgments in eviction proceedings are obtained with machine-gun rapidity, since the indigent cannot afford counsel to defend. Housing laws often have a built-in bias against the poor. Slumlords have a tight hold on the Nation. Lyford, The Airtight Cage (1966).[2] And see Schorr, Slums and Social Insecurity (1964).

---

[2] "They have not the economic power to make themselves heard, and their official political representatives have built their power on the ghetto and are committed to its perpetuation. In New York City a vast, informal machinery funnels society's discipline and health problems into the West Ninety-third Streets, and just about every sector of the establishment participates in running the machinery or lubricating it: slumlords who rent to the dead as well as the living provided they get a good price for it and have immunity from fire, building, health, and rent regulations; the city employee who collaborates in the arrangement; the welfare and health departments that go along because they have no other alternative; judges who tap the slumlord on the wrist on the rare occasions when he is brought into court. Approval of the system is

The plight of the poor is being somewhat ameliorated by federal and state programs (particularly the Neighborhood Legal Services under OEO) and by private organizations dedicated to the representation of indigents in civil matters. This Court of course does not sit to cure social ills that beset the country. But when we are faced with a statute that apparently violates the Equal Protection Clause by patently discriminating against the poor and thereby worsening their already sorry plight, we should address ourselves to it. I would grant certiorari.

MR. JUSTICE BRENNAN is also of the opinion that the petition for a writ of certiorari should be granted.

---

given by business leaders who lead the fight against adequate welfare and housing, prosperous financial institutions that refuse to lend money for private investment in slum rehabilitation; foundations that avoid any significant commitment to abolition of the slum; labor unions that have abandoned the low-paid worker and practice racial discrimination; and white and black political organizations that have a vested interest in segregation and race politics. When the slum is used as a concentration camp for the criminal and disabled, the virulence of all the diseases endemic in slum life is intensified." Lyford, *supra,* at xxi–xxii.