Nathan R. Sobel, J.
Helen Jeffreys is ¡suing her husband of 14 years for divorce based on .abandonment of this plaintiff and their nine children.
Living on public assistance and not possessing any income or resources “ to pay the costs, fees and expenses necessary to prosecute * * * the action ” (CPLR 1101) she applied for and obtained leave to prosecute as a poor person. Her counsel are acting without compensation under the Legal Services Program of the Office .of Economic Opportunity.[1]
Diligent efforts to ascertain the present whereabouts of her husband having proved fruitless, plaintiff applied for and *1046 obtained from another Judge an order permitting service by publication (CPLR 308, subd. 4; 316).
On August 9,1968, this court upon consent of the city entered an order directing that the “ expense ” of publication amounting to about $300 be paid by the city. My brief decision (57 Mise 2d 416) established an important and perhaps costly precedent. For that reason, the city has asked leave to -withdraw its consent and to relitigate the issue. The city understandably desires authorization which can only be had upon a high court determination of its obligations under the poor persons statutes. Of course, that motion is granted. My decision and the opinion upon which it was based is withdrawn. I necessarily deal more fully with .the issues.
There .are two issues to be determined.
1. Do the poor persons statutes .(CPLR 1101, 1102) require the city to pay the cost of serving :a summons by publication?
2. Do the service by publication statutes (CPLR 308, subd. 4; 314; 315; 316; cf. Domestic Relations Law, § 221) invidiously discriminate against poor persons in matrimonial actions to deny them equal access to the courts under the Equal Protection clauses of the State and Federal Constitutions (N. Y. Const., art. I, .§ 11; U. S. Const., 14th Amdt.) ?
I.
Is the cost of publication (payable to designated newspapers) a “ cost ”, “fee” or “ expense ” within the meaning of the two pertinent statutes ( CPLR 1101, 1102) ?
Some history is relevant. Poor persons or in forma pauperis suits were recognized at the common law even in the absence of statutory authorization. The power of the English common-law courts, independently of .statute, was probably confined solely to the waiver of fees payable to ministers of justice (including Judges who were on a fee basis) and public .officers (including Clerks, Constables and Sheriffs). Later .statutes (see 11 Henry VII, ch. 12 [1494]; Elizabeth I, Instruction to Lord President and Council of the North, 43 Eliz. I, ch. 2 [1601]) expressly authorized ‘ ‘ waiver ’ ’ of fees .and expanded by istatute the common-law privileges of poor persons to .include assignment of counsel and forgiveness of costs if the litigation proved unsuccessful. (Martin v. Superior Ct., 176 Cal. 289, [1917]; .see, also, Note, Litigation Costs: The Hidden Barrier to the Indigent, 56 Georgetown L. J. 516, 518-520 [1968].)
New York followed the English common law as expanded by statute. The first consolidation of the scattered poor person *1047 provisions was effected under the Revised Statutes of 1828 without change. (See Report of Commrs. Appointed to Revise the Statute Laws of this State [Proposed Revision, part III, ch. VIII, 1828].) As a comprehensive statutory scheme governing civil actions only, the pertinent statutes (Rev. Stat., part III, ch. VIII, tit. 1) then .read:
“ Section 1. Every poor person, not being of ability to sue, who shall have a cause of action against any other, may petition the court in which such action is depending, or in which it is intended to be brought, for leave to prosecute as a poor person, and to have counsel and attorneys assigned to conduct his suit. # * *
“ § 4. Every person so admitted, may prosecute his suit without paying any fees to any officers or ministers of justice * * * and if he be non-suited, or a verdict or judgment be given against him * * * he shall not be liable for any costs in such suit.”
This early ¡statute was quite generous for our courts like the English courts operated almost exclusively on a fee basis — fees were payable to Judges (see R. Pound, Organization of Courts, p. 156 [1940]) clerks, registers, sergeants-at-arms, criers, sheriffs, coroners and constables by the civil litigant (see Part III, ch. X, tit. III Revised Statutes [1828]).
The next recodification took place in 1876 with the adoption of the Code of Civil Procedure (L. 1876, ch. 448). The fee system had been largely abolished. The only change from the 1828 statute was the elimination of reference to fees of “ ministers of justice ” (Code Civ. Pro., § 461).
From the code the poor persons statutes were transferred to the Civil Practice Act (L. 1920, ch. 925) but again scattered through various parts thereof. (See Civ. Prac. Act, §§ 196-199; Rules of Civ. Prac., rules 35, 36, 37; Civ. Prac. Act., § 1455 later .renumbered § 1493.)
The one significant substantive change from the earlier statutes, was made in 1936 (L. 1936, ch. 166). While theretofore stenographers’ fees were “ waived,” i.e., transcripts were required to be furnished by the court-employed stenographers free of charge to the poor person, the new statute provided for payment for this service to the stenographers out of public funds. Thus, the largest single “ expense ” of civil litigation, became a public charge.
Thus matters stood when the Advisory Committee recommended that the -scattered poor person’s ¡statutes be consolidated in article 11 of the CPLR, adding the new article ‘£ is merely *1048 a recodification of the present statutes and rules.” (Second Preliminary Rep. of Advisory Committee on Practice and Procedure, p. 387.)
I necessarily conclude, contrary to my earlier opinion (57 Mise 2d 416), that in view of such expressed intention, no significance can be attached to the use by the Revisors of the new ■terms “ expenses ” (CPLR 1101) and “ costs and fees ” (CPLR 1102, subd. [d]).
Except for the 1936 provision, supra, for the payment of the cost .of transcripts to the court stenographers out of public funds, the existing statutes, in my opinion, have no different meaning than the quoted provisions of the Revised Statutes of 1828.
For poor persons in civil litigation, the existing statutes (1) permit assignment of counsel (CPLR 1102, subd. [a]; see, also, Weinstein-Korn-Miller, N. Y. Civ. Prac., par.. 1102.01); (2) waive all manner of fees payable to public officers whether destined for his own pocket or the public treasury (CPLR 1102, subd. [d]); (3) forgive payment of costs to a successful adversary (CPLR 1102, subd. [d]); and (4) provide for the payment out of public funds .of free transcripts under stated circumstances (CPLR 1102, subd. [b]). (See, also, People ex rel. King v. McNeill, 30 Mise 2d 566.)
The category of expenses payable by litigants to third persons 'other than public officers, commonly labelled “ auxiliary expenses ”, the poor person’s statutes do not cover. These include, in addition to publication costs, witness fees, printing expenses, expert witnesses and general investigation costs. That some of these are by statute “taxable disbursements” (CPLR, art. 83) does not of course make them payable in the first instance out of public funds on behalf of poor person litigants.
My view that our poor person’s statutes do not authorize payment of such auxiliary expenses is supported by an examination of the in forma pauperis statutes in other jurisdictions. Some 34 jurisdictions, including the Federal (U. S. Code, tit. 28, § 1915), have such statutes (see Note: Proceedings in Forma Pauperis, 9 Univ. Fla. L. Rev. 65 [1956]). There is little difference in coverage. All such statutes are based on the common law as confirmed and expanded by statute (supra). However *1049 only a few have provided by such statutes, as New York did in 1936, for the furnishing of free transcripts at public cost.[2]
The essential point is that none of the in forma pauperis statutes make provision for payment of the category of “ auxiliary expenses ” out of public funds!
In this same connection, it is helpful to observe the experience in the criminal sector.
Prior to Griffin v. Illinois (351 TJ. S. 12 [1956]) (discussed in Part II, infra), which made payment of certain auxiliary expenses a matter of constitutional necessity (see People v. Montgomery, 18 N Y 2d 993), it is significant that whenever public funds for the assistance of indigent criminal defendants were required to be expended provision therefor was made by statute '(Code Grim. Pro., § 308). Thus in 1893 (L. 1893, ch. 521) provision was made for paid assigned counsel in capital cases; in 1897 (L. 1897, ch. 427) for the payment of all auxiliary expenses of such counsel; in 1918 (L. 1918, ch. 242) for the expense of paid expert witnesses; in 1923 (L. 1923, ch. 355) for daily copy of trial minutes.
After Griffin made provision of certain auxiliary expenses a matter of constitutional necessity, the New York courts did, however, mandate the furnishing of free transcripts and authorized waiver of certain filing fees without specific statutory authority. (People v. Pride, 3 N Y 2d 545; People v. Pitts, 6 N Y 2d 288; People v. Borum, 8 N Y 2d 177.)
Also, prior to the constitutional mandate for free counsel (Gideon v. Waimoright, 372 U. S. 335; Douglas v. California, 372 U. S. 353) our Court of Appeals in People v. Price (262 N. Y. 410, 412) had held: “ Even prior to section 308 of the Code of Criminal Procedure, there was inherent power in the courts to assign counsel to defend a prisoner who was without an attorney and unable to employ one.”
Thus while courts granted relief in some instances to indigent defendants without statutory authorization because constitutionally compelled (see People v. Watson, 36 111. 2d 228) or under their inherent power, no decision mandated payment of “ auxiliary expenses ” out of public funds. Filing fees were ordered waived; transcripts were furnished free of cost; print *1050 ing was dispensed with; .and counsel were assigned without compensation.
However in 1965, in response to and indeed beyond Griffin’s mandate, the Legislature adopted a comprehensive plan for payment out of public funds of the cost of counsel and all auxiliary expenses necessary to defend any criminal prosecution (County Law, art. 18-B).
In summary, this ‘ ‘ history ’ ’. establishes that whenever an expenditure for payment of the category of auxiliary expenses out of public funds on behalf of poor persons in civil actions or on behalf of indigent defendants in criminal actions was required, it was authorized by statute. It is also established that the Legislature has rarely been reluctant to do so (CPLR 1102, ,subd. [b]; County Law, art. 18-B; Code Grim Pro., § 308; Mental Hygiene Law, ■§ 72).
The plain fact is that because of our comprehensive poor persons statutes covering as they do all manner of filing fees, forgiveness of costs and the furnishing of free transcripts, the problem .of the category of “auxiliary expenses ” has never been urgent in our 'New York civil courts. In personal injury actions these expenses are paid by attorneys under contingent retainers. In other civil actions likely to be brought by or against indigent litigants such auxiliary expenses as witness fees are minimal; expert witnesses, printing costs and general investigation costs are rarely" necessary and if needed are dispensable.
Publication as such an expense is required solely in actions for divorce based on abandonment (Domestic Relations Law, § 170, subd. 2) and in actions for the dissolution of marriage (Domestic Relations Law, § 221). Because of the recent liberalization of the grounds for divorce this problem now comes to the fore.
The main problem for indigent litigants has been the cost .of counsel. This problem is being met to an extent by legal aid and Office of Economic Opportunity lawyer service agencies. Recent amendments to the Social Security Act will make substantial Federal aid available to States and municipalities adopting a plan for free legal services to welfare recipients (N. Y. L. J., Dec. 3, 1968, p. 1, col. 3).
I conclude .that the poor persons statute (CPLR 1102) does not authorize the payment of the expense of publication. This, although that statute “ shall be liberally construed to .secure the just, speedy and inexpensive determination of every judicial proceeding” (CPLR 104; see Coppedge v. United States, 369 U. S. 438).
*1051 I conclude also that unless constitutionally mandated (see discussion in part II, infra) the courts do not have the inherent power to direct payment of this category of ‘ ‘ auxiliary expense ’ ’ out of public funds. This latter conclusion is not to be understood to include any other category such as waiver of fees, forgiveness of costs, and forgiveness of furnishing security. For, in the absence of in forma pauperis statutes, courts do appear to have and to have exercised such power (Martin v. Superior Ct., 176 Cal. 289, supra [1917] ; Hickey v. Rhine, 16 Tex. 576; Tift v. Towns, 63 Ga. 237; Shearman v. Pope, 106 N. Y. 664; Irving v. Garrity, 13 Abb. N. C. 182; cf. Boddie v. Connecticut, 286 F. Supp. 968).
II.
Do the service by publication statutes (CPLR 308, subd. 4; 315; 316; 317; cf. Domestic Relations Law, § 221) invidiously discriminate against poor persons in matrimonial actions to deny them equal access to the courts under the Equal Protection Clauses of the State and Federal Constitutions? (N. Y. Const., art. I, § 11; U. S. Const., 14th Amdt.)
This is relatively a much narrower issue than the general problem of public subsidization of expenses of the poor in civil litigation discussed in the American Bar Foundation Report “ Public Provision for Costs and Expenses of Civil Litigation ”: “ Merely eliminating court fees and costs would not be enough to make the courts accessible to the poor. Some system is needed to cover the auxiliary expenses of litigation such as publication fees, bond premiums, fees of investigators and expert witnesses and * * * court stenographers.” (p. 5, 1966 draft.)
In the first place publication costs, unlike others (e.g., witness fees, jury fees, transcripts, expert testimony) deny access to the courts; the others do not. In the second place, an action for divorce is fundamentally different from actions in contract or concerning real property. The latter may be brought or not brought; they may be settled out of court. But our State Constitution (art. I, § 91) mandates that divorces may be granted only by ‘ ‘ due judicial proceedings. ’ ’ Furthermore State statutes dictate who may marry; by whom the marriage may be performed; the obligations of the parties during marriage; the grounds for separation or divorce and the obligations of the parties after the termination of the marriage. For all purposes the State is very much a ‘ ‘ partner ” to ,a marriage and a “party” in a matrimonial action. (See Foster, “Marriage: A Basic Civil Right of Man,” Fordham L. Rev., Oct., 1968.)
*1052 With these important observations we may turn to the consideration of the cases.
A prime observation in this regard is that nearly all of the constitutionally based high court decisions affording relief from the handicaps of indigency concern criminal defendants. And since for them access to the trial courts is .scarcely a problem, the decisions .are concerned with access to appellate courts, directly or collaterally, to review judgments of conviction. (Griffin v. Illinois, 351 U. S. 12, supra; Eskridge v. Washington Prison Bd., 357 U. S. 214; Burns v. Ohio, 360 U. S. 252; Smith v. Bennett, 365 U. S. 708; Long v. List. Ct. of Iowa, 385 U. S. 192; People v. Pride, 3 N Y 2d 545, supra; People v. Pitts, 6NY 2d 288, supra; People v. Hughes, 15 N Y 2d 172; People v. Montgomery, 18 N Y 2d 993, supra; Barter v. Gladden, 210 Ore. 46.)
Apart from some beginnings or glimmerings (discussed infra) there are as yet no similar judicial constitutional commands in civil actions. This may be due to the existence of in forma pauperis statutes long predating similar statutes in the criminal area. It may be due to the fact that as yet only a tiny fraction of civil litigants but a majority of criminal defendants are indigent. (See Silverstein, “ Defense of the Poor in American State Courts ” 1965 Report of American Bar Foundation.)
Primarily however it seems to be due to the fact that criminal cases present constitutional concerns more compelling than and not always present in civil cases. In criminal cases, the State is of course always a party. Except as noted in matrimonial cases, the State is not necessarily a party in civil actions.
In the sphere of criminal justice, constitutional doctrine affording relief from fees and expenses rests mainly upon the Equal Protection Clause. Yet historically that clause has been applied much more frequently in civil than in criminal actions. (See Chief Justice Warren, Fourteenth Amendment: Retrospect and Prospect, N. Y. L. J., Oct. 16, 1968, note 53.)
Equal access to the civil courts was among the Fourteenth Amendment’s primary objectives: “ that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts” (Truax v. Corrigan, 257 U. S. 312, 334).
The Fourteenth Amendment is derived from the Civil Rights Act of 1866, now section 1981 et seq. of title 42 of the United States Code (Frank and Munro, The Original Understanding of “ Equal Protection of the Laws ”, 50 Col. L. Rev., 131, 141, *1053 167-168). That statute in specific terms provides for equal access to the civil courts.
With these considerations in mind, we turn to the landmark case of Griffin v. Illinois (351 U. S. 12, supra). Griffin after his conviction sought, but was denied by the Illinois courts, a free transcript essential to access to the appellate courts. Griffin was not of course denied access to the trial court; criminal defendants are brought coercively into that court. Nevertheless the court, in this regard, theorized (pp. 17-18): “ Surely no one would contend that either a State or the Federal Government could constitutionally provide that defendants unable to pay court costs in advance should be denied, the right to plead not guilty or to defend themselves in court. Such a law would make the constitutional promise of a fair trial a worthless thing * * * In criminal trials, a State can no more discriminate on account of poverty than on account of religion race or color. Plainly the ability to pay costs in advance bears no rational relationship to a defendant’s guilt or innocence and could not be used as an excuse to deprive a defendant of a fair trial.”
With respect to the main issue, the court noted that Illinois like most other States affords an absolute right to an appeal (pp. 18-19): “ Statistics show that a substantial proportion of criminal convictions are 'reversed by state appellate courts. Thus to deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside. * * * There can be no equal justice where the kind of a trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough-to buy transcripts.”
' Griffin adds a totally new perspective to the traditional concept of equal protection. It differs from earlier cases in that the State statute (or “ State action”) did not discriminate on its face; nor did it seek to overclassify or underclassify or classify groups arbitrarily; nor, though neutral in formulation, was its application by the State willfully discriminatory. (Yick Wo v. Hopkins, 118 U. S. 356; Barbier v. Connolly, 113 U. S. 27; Cochran v. Kansas, 316 U. S. 255; Skinner v. Oklahoma, 316 U. S. 535; Snowden v. Hughes, 321 U. S. 1; Dowd v. Cook, 340 U. S. 206; Brown v. Board of Educ., 347 U. S. 483.) None of these traditional tests apply.
Moreover Griffin holds that distinctions based on wealth — at least those that discriminate against basic rights of the poor —■ are assimilated to distinctions based on race and like those will be presumed invalid. (Loving v. Virginia, 388 U. S. 1; *1054 Rinaldi v. Yeager, 384 U. S. 305; McLaughlin v. Florida, 379 U. S. 184.) For a criminal defendant this is not an extreme doctrine, which it might perhaps be when applied to a civil litigant.
The Illinois statute in Griffin (like the Few York publication statute at issue) was completely neutral on its face; it was not purposed to discriminate against the indigent; it was not applied by the State in a manner willfully discriminatory. But, though neutral in purpose and intent and applied impartially to rich and poor alike, its effect was discriminatory when applied however equally to unequal groups. This, the Griffin court said, is a denial of equal protection when it makes basic rights ineffective. The inability of an indigent defendant to appeal was as complete as if the statute had denied this right in specific terms.
Thus Griffin is based on the totally novel doctrine that unintentional and accidental inequality if it affects important rights of the poor violates equal protection to the same extent as does intentional, hostile, aggressive and invidious discrimination.[3]
Griffin and its progeny are criminal cases. But, as noted, the Equal Protection Clause has been applied more frequently to civil cases, for example, to political matters. (Carrington v. Rash, 380 U. S. 89 ; Gray v. Sanders, 372 U. S. 368; Baker v. Carr, 369 U. S. 186.) Most recently Griffin principles have been applied in such a matter in holding that a State poll tax, not intentionally discriminatory nevertheless violates equal protection because it denies to the poor the basic right to vote (Harper v. Virginia Bd. of Elections, 383 U. S. 663).
Both Griffin and Harper evidence a balancing approach — whether the underlying right denied is of such substantial magnitude as to make it unjust and discriminatory for the State to impose a money hurdle to the exercise of that right — Griffin’s cost of a trial transcript; Mrs. Harper’s $1.50 poll tax or Mrs. Jeffreys’ $300 cost of publication.
Foreshadowing application of Griffin principles to auxiliary expenses in civil cases is the dissent to denial of certiorari by *1055 Mr. Justice Douglas, joined by the Chief Justice (Mr. Justice Brennan also dissenting) in Williams v. Shaffer (385 U. S. 1037, 1039-1040):
“ This case * * * vividly demonstrates the disparity between the access of the affluent to the judicial machinery and that of the poor in violation of the Equal Protection Clause. * * *
“ The effect of the security statute is to grant an affluent tenant a hearing and to deny an indigent tenant a hearing. The ability to obtain a hearing is thus made to turn upon the tenant’s wealth. On numerous occasions this Court has struck down financial limitations on the ability to obtain judicial review * * * It is true that these cases have dealt with criminal
proceedings. But the Equal Protection Clause of the Fourteenth Amendment is not limited to criminal prosecutions. Its protections extend as well to civil matters. I can see no more justification for denying an indigent a hearing in an eviction proceeding solely because of his poverty than for denying an indigent * * * the right to obtain a transcript necessary for appeal (Griffin v. Illinois, supra).”
There is also a quite recent decision by a three-Judge-panel Court (U. S. Dist. Ct., Conn.) in the case of Boddie v. State of Connecticut (286 F. Supp. 968). In that case filing fees in matrimonial actions were involved. Commenting upon the failure of Connecticut to adopt in forma pauperis laws; the confinement of the Griffin doctrine as yet to criminal cases; the duty to recognize affluent society’s obligations to its disadvantaged people, that court concluded (p. 974): “ Although with some hesitation, we conclude that the court should not, by resort to the Constitutional guarantees which for 100 years have been considered not to demand such state action, attempt to speed up the amelioration of the lot of the indigent by forcing the state to provide free access to the civil courts without payment of a relatively modest fee. We should rather leave this to correction by the political process through legislative action, which may reach a more satisfactory result more speedily than the present available machinery of the courts can effectively accomplish. ’ ’
This decision represents a laudable abstention attitude by a Federal court,
Thus, there are beginnings and glimmerings of a Griffin doctrine for civil cases — simply that, because the establishment of civil courts for enforcing claims and vindicating legal rights is so fundamental, the State cannot close the system to any person because of poverty. Also congressional recognition of the prob *1056 lem is manifested by the provisions of the Social Security Act of 1967 affording free counsel to indigent civil litigants in matrimonial, landlord-tenant, consumer debt, and other civil legal problems.
Marriage is clearly marked with the public interest. In this State, a marriage cannot be dissolved' except by “ due judicial proceedings ” (N. Y. Const., art. I, § 9). We have erected by statute a money hurdle to such dissolution by requiring in many circumstances the service of a summons by publication (CPLR. 308, subd. 4; 315, 316, 317; Domestic Relations Law, § 221). This hurdle is an effective barrier to Mrs. Jeffreys’ access to the courts. The loss of access to the courts in an action for divorce is a right of substantial magnitude when only through the courts may redress or relief be obtained. Such a right is, it seems to me, as basic as Griffin’s right to appeal and Mrs. Harper’s right to vote. It is manifestly discriminatory under Griffin standards to deprive Mrs. Jeffreys of that right while affording it to others with money.
I hold that she has been denied the equal protection of the laws guaranteed to her by the State and Federal Constitutions.
Such a holding by a trial court in a test case such as this serves merely the purpose of moving the issue to those appellate courts which must finally determine it.
Basic to my determination is the conviction that among those who are the victims of our nation’s most serious problem, poverty, there must exist a widely held belief that not only the sanctions of law but also its benefits are fairly distributed.
III.
A holding that the Equal Protection Clauses prohibit the State from denying Mrs. Jeffreys access to the court because of poverty justifies also a direction that the City of New York must pay her publication cost. A court may of course enforce a constitutional command by enjoining public officers from collecting or 'charging a fee or expense. It may also command the payment of auxiliary expenses out of specified public funds when the Legislature, exercising front-line responsibility, has in other related areas designated the treasurer of the city or county as the general source of such funds (CPLR 1102, subd. [b]; County Law, art. 18-B; Mental Hygiene Law, § 77; Code Crim. Pro., § 456).
With respect however to the cost of publication, both legislative and judicial alternatives exist. These are briefly discussed.
*1057 Publication is merely one facet of the notice problem; notice in turn is a facet of due process (Dobkin v. Chapman, 21 N Y 2d 490; Schroeder v. City of New York, 10 N Y 2d 522, revd. 371 U. S. 208; Mullane v. Central Hanover Trust Co., 339 U. S. 306; Walker v. Hutchinson City, 352 U. S. 112).
It is idle to discuss the relative merits of the various forms of “ substituted service,” other than personal, permitted by our statutes, e.g. (1) nailing and mailing; (2) delivery to a person of suitable age and discretion; (3) such other method as the court directs (CPLR 308, subd. 4), and (4) publication.
Obviously none of these methods except publication is available when the continued existence of a party is unknown or when a party either adventitiously or purposely cannot with due diligence be served within or without the State. Under such circumstances only publication adequately meets the notice requirements of due process — if sufficient in “ extent” (number of newspapers) and “ duration ” (number of days published). Heavy emphasis is placed by the decisions on extent of coverage. It is noteworthy that due process standards are fully satisfied by publication even in a single newspaper for shorter duration when that newspaper is “ officially designated” and one in which such notices and related notices customarily appear.
Also when statutory notice requirements are bolstered by a protective “ bar ” statute such as CPLB 317, the extent and duration of publication may be further limited yet satisfy fully due process standards (Dobkin v. Chapman, 21 N Y 2d 490, 500, supra).
In matrimonial actions, service within or without the State is restricted either to personal service or service by publication; none of the other forms of substituted service are permitted. This is not by virtue of the express provisions of the practice sections (CPLR 308, 314) but because it is so provided by section 232 of the Domestic Belations Law (formerly Civ. Prac. Act, § 1167 )[4].
The extent and duration of publication and the cost thereof are fixed by statute (CPLB 316, 8007). The Advisory Committee had recommended publication in one newspaper at least once in each of four successive weeks. The Legislature however provided for two newspapers, thus effectively doubling the recommended cost of publication.
*1058 In summary of the foregoing, two points are briefly made.
(1) CPLR 316 is a rule which either the Legislature or the Judicial Conference may amend. An amendment, limited to publication in forma pauperis, may reduce the extent and duration of such publication, yet constitute a reasonable classification and meet due process standards. Should such an amendment also specify a single “ officially designated ” newspaper (e.g., New York Law Journal) the “ rates ” could be fixed by agreement as has been done on occasion in the past.
(2) Courts, too, have the discretion to limit the extent and duration of publication under some circumstances.
It should be noted that CPLR 315 and its related CPLR 316 are clearly applicable only to service without the State (see Notes of Advisory Committee: Second Preliminary Report proposed rule 25.5, pp. 166, 167; Final Report proposed rule 355, pp. A306~307). The specific requirements of CPLR 316 as to extent and duration of publication therefore are only mandated when the defendant manifestly is without the State.
Under all other circumstances, publication is regulated in the court by CPLR 308 (subd. 4). (See 1 Weinstein-KornMiller, N. Y. Prac., par. 3116.80.) That section vests broad discretion in the court with respect to extent and duration of publication. The discretion must be exercised in conformity with due process (Dobkin v. Chapman, 21 N Y 2d 490, supra) and in respect of legislative policy manifested by CPLR 316.
It is suggested that CPLR 308 (subd. 4) may be utilized and the extent and duration of publication reasonably limited only when the supporting affidavits allege and establish that the absconding defendant is a domiciliary of the State; that there is no evidence to establish or reason to believe that he is presently outside the State; and that no application will be made for an in personam judgment in the decree sought — reserving however such rights to alimony and support which may be later awarded after personal service pursuant to the provisions of the Domestic Relations Law and the Family Court Act (Milliken v. Meyer, 311 U. S. 457).
With respect to duration of publication under CPLR 308 (subd. 4) it is suggested that a “ safe ” minimum is one newspaper (preferably one officially designated) once each week for three successive weeks (cf. Domestic Relations Law, § 221).
# * #
Applications for leave to serve a summons by publication under the poor person’s statutes (CPLR 1101, 1102) must be made upon notice to the City Treasurer or County Attorney, as the case may be, to afford such officers the opportunity to contest *1059 not only the claim of indigency but also the claim that personal service cannot be effected with due diligence.[5]
If the cost of publication is to be paid, from public funds, the court too has a responsibility to scrutinize these allegations.
All such suggestions, if adopted, will serve to minimize the financial burden upon public funds.
Upon reargument, the foregoing shall constitute the decision of the court.

. One of the purposes of the program is to make new law through test cases; see Shriver, Law Reform and the Poor, 17 Amer. Univ. L. Rev. 1 (Dec., 1967). This is such a test case.

. In this regard the Minnesota Supreme Court has recently held, that in the absence of statutory authority in the in forma pauperis statute, courts do not possess inherent power to mandate free transcripts in civil eases. Karren V. Hennepin County Welfare Dept. (276 Minn. 554). This case was purposed aa a test but was dismissed by the Supreme Court sub nom. Munkelwitz v. Hennepin County, 392 U. S. 918 as moot when the welfare district agreed to pay such costs out of welfare funds.

. Judge Haelau, in dissent, argues that the court in its equal protection approach has incorrectly equated the reasonableness of a classification where the State imposes legal disabilities, with the reasonableness of the State’s failure to remove natural disabilities. The latter he contends is never a violation of equal protection but may be a violation of due process, i.e., fundamental fairness if earned to an extreme. But he argues since a State need not provide an appeal at all, denial of access to the appellate courts does not violate due process. That the State need not provide an appeal in criminal cases is a conclusion with which the majority seems to agree (?) but obviously such a possibility could make criminal trials less satisfactory than a determination of guilt by a litmus paper te$t.

. The practice section CPLR 308 as originally drafted (Rule 352b) provided that present ,308 (subds. 3, 4) were not to apply to matrimonial actions. What emerged from the Legislature is quite the opposite. (See Final Report Advisory Committee, Jan. 4, 1961 pp. A300-301; see, also, comment in Ninth Annual Report of N. Y. Judicial Conference, 1964, pp. 49-50.)

. It may be noted .that the services of the Social Security and Internal Revenue agencies are now available to locate parents who abandon children (U. S. Code, tit. 42, § 402; Code of Fed. Reg., tit. 20, § 401.3, subd. [s], eff. Jan. 1, 1969).