**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC., et al., Plaintiffs,**

**v.**

**ELF ATOCHEM NORTH AMERICA, INC., Defendant.**

Civ. No. 89–3946.

United States District Court, D. New Jersey.

March 31, 1993.

Bruce J. Terris, Laureen M. Tyler, Terris, Pravlik & Wagner, Washington, DC, Edward Lloyd, Newark, NJ, for plaintiffs.

Peter John Sacripanti, John T.S. Williams, Dewey Ballantine, New York City, for defendant.

## OPINION

GERRY, Chief Judge.

The Public Interest Research Group of New Jersey ("NJPIRG") and Friends of the

**1168**

Earth ("FOE") bring this citizen suit under § 505 of the Clean Water Act,[1] 33 U.S.C. § 1365, against Elf Atochem North America, Inc. (previously Pennwalt Corporation).[2] Plaintiffs allege that defendant violated provisions of its discharge permit, issued pursuant to § 402(a) of the Act, 33 U.S.C. § 1342(a), for a facility located in Thorofare, New Jersey. This permit sets limits on the amount of pollutants that defendant may discharge into the Delaware River and one its tributaries, Little Mantua Creek.

Plaintiffs' complaint originally sought injunctive relief as well as civil penalties, but the claim for injunctive relief was withdrawn after defendant sold the facility in October 1990. Presently before the court are defendant's motion to dismiss, two motions by plaintiffs for partial summary judgment as to liability, and defendant's cross-motion for summary judgment.

## I. Background

In 1972, Congress enacted the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, with the express goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). The Act prohibits the discharge of any pollutants into the nation's waters except pursuant to specific authorization as provided for in the Act.

Pursuant to Title IV of the Act, 33 U.S.C. §§ 1341–1345, discharge permits can be issued to particular entities, allowing them to discharge limited amounts of pollutants into surface waters. The permit involved in this case was issued pursuant to the National Pollutant Discharge Elimination System ("NPDES") as created by § 402(a)(1) of the Act, 33 U.S.C. § 1342(a)(1). Section 402(a)(1) authorizes the Administrator of the United States Environmental Protection Agency ("EPA") to issue permits authorizing the limited discharge of pollutants in accordance with national standards promulgated by the Administrator. Failure to comply

with a permit constitutes a violation of the Act itself. *See id.* §§ 1342(k), 1344(p). Under the Act, permit violators may be subject to civil or criminal penalties through either government enforcement action, *see id.* §§ 1319, 1342(b)(7), or court actions like this one brought by private citizens, *see id.* § 1365(a).

The enforcement mechanisms in the Act are structured so as to streamline the enforcement process and "to avoid the necessity of lengthy fact finding [proceedings]." S.Rep. No. 414, 92d Cong., 1st Sess., 64 *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3730. Toward this end, the Act imposes responsibility for monitoring and reporting pollutant levels in their discharges on the permit holders themselves. NPDES permits require permit holders to establish and maintain records; to install, use, and maintain monitoring equipment; to sample effluent; and to submit regular reports to the EPA. *See* 33 U.S.C. § 1318(a)(4)(A). These reports are called "discharge monitoring reports" ("DMRs") and must be submitted at regular intervals specified in the permit. *See* 40 C.F.R. § 122.41(1)(4) (1992). Federal regulations provide for criminal penalties for the submission of false information in these reports, *see id.* § 122.41(k)(2), and impose an affirmative obligation on permit holders to correct any past errors or omissions in reporting of which they subsequently become aware. *See id.* § 122.41(1)(8).

In 1982, the EPA delegated responsibility to the New Jersey Department of Environmental Protection and Energy ("NJDEPE") to administer the NPDES program in New Jersey. 47 Fed.Reg. 17331 (1982). On November 26, 1984, NJDEPE issued an NPDES permit effective January 1, 1985, authorizing Pennwalt to discharge limited quantities of pollutants into Little Mantua Creek and the Delaware River through two discharge points in accordance with conditions set forth in the permit.

---

**1.** This statute is also referred to as the Federal Water Pollution Control Act.

**2.** The complaint originally named Pennwalt Corporation as defendant, but Pennwalt subsequently underwent two corporate mergers and

emerged with a new name, "Elf Atochem North America, Inc." Although the new name has been officially substituted in the caption of this case, we continue to refer to defendant as "Pennwalt" for clarity's sake.

Pennwalt's Thorofare facility began operating in August 1985. It manufactured fluoropolymers (polyvinylidene fluoride/vinylidene fluoride and their byproduct, hydrochloric acid). Waste water from the facility passed through its waste water treatment system before being discharged into either Little Mantua Creek or the Delaware River.

Plaintiffs, after providing 60 days notice of their intent to sue as required under the Act, 33 U.S.C. § 1365(b)(1)(A), filed this action on September 18, 1989, alleging that Pennwalt had committed and continued to commit numerous and repeated violations of the discharge, monitoring, and reporting requirements of its permit. Plaintiffs originally sought both civil penalties and injunctive relief, but they dropped their request for injunctive relief after the defendant sold the Thorofare facility in October 1990. Their claim for civil penalties under 33 U.S.C. § 1319(d) remains before us.

Meanwhile, NJDEPE was also taking action against Pennwalt. On March 31, 1989, NJDEPE sent Pennwalt a "Compliance Evaluation Inspection Report" with a cover letter informing Pennwalt that the facility had been given a rating of "unacceptable" and instructing Pennwalt to take corrective measures. On August 25, 1989, NJDEPE issued an Administrative Order and Notice of Civil Administrative Penalty Assessment ("Administrative Order") proposing a penalty of $370,250 against Pennwalt. Negotiations between NJDEPE and Pennwalt eventually led to a settlement of that action, and a consent order was signed on April 24, 1992.

Under the terms of the consent order, Pennwalt had to pay a penalty of $275,000. The consent order states that it is "in full settlement of all civil and administrative claims and liability that might have been asserted by [NJDEPE] under the Water Pollution Control Act, N.J.S.A. 58:10A–1 *et seq.*" for the violations set forth in Appendix A. Appendix A includes virtually all of the violations alleged by plaintiffs in this action.

Defendant contends that its facility represented "state-of-the-art technology" for waste water treatment and that most or all of the apparent violations alleged by plaintiffs were caused by laboratory error. During the period in question, the facility's waste water samples were tested by an NJDEPE-certified laboratory, National Environmental Testing ("NET"). Defendant has taken a number of steps to try to determine the accuracy of NET's results and the propriety of its procedures.

First, in September 1989, around the same time that this suit was filed, Pennwalt retained another laboratory, Northeastern Analytical Corporation ("NAC"), to check the accuracy of the testing being performed by NET. Accordingly, from September 1989 through mid-February 1990 the samples collected at the facility were split such that half of each sample was sent to NET and half to NAC for parallel testing. There were substantial discrepancies between the results reached by the two laboratories, but the discrepancies reveal no clear pattern. Sometimes NET's results were higher and sometimes NAC's results were higher. Over a period of four months, NET reported pollutant levels in excess of the permit limits on eight occasions where NAC's measurements of the same samples found no violations, and NAC found two violations where NET's results showed compliance with the permit.

In order to confirm that NET's rather than NAC's results were incorrect, Pennwalt hired a third laboratory in December 1989, Princeton Laboratories. Again, there were substantial discrepancies between the results of the three laboratories, but no clear pattern can be discerned from these results that would indicate that NET's results were always the erroneous ones. On three occasions, however, NET's measurements indicated pollutant levels above the applicable permit limitations, while tests by both NAC and Princeton yielded levels well below the limit. With respect to two of these, the sample had actually been split four ways. The fourth test, performed by NJDEPE's laboratory, confirmed NAC's and Princeton's results.

Finally, in February 1990, NET's laboratory was subject to audits by the EPA and by an environmental consultant hired by Pennwalt. Both audits revealed substantial departures from acceptable laboratory proce-

dures. Soon after that, Pennwalt stopped using NET to test its samples.

Around the same time, Pennwalt also hired a waste water treatment design firm, Eckenfelder, Inc., to inspect the Thorofare Facility's treatment system. Eckenfelder concluded that the Facility's system constituted state-of-the-art technology for the types of waste water generated by the facility and that the system was performing at or near the highest possible efficiency. Recommendations for minor enhancements of the system were made by Eckenfelder and were subsequently implemented by defendant.

This case is presently before the court on defendant's motions to dismiss[3] and for summary judgment and on two motions by plaintiffs seeking partial summary judgment as to liability for 1,688 discharge violations, 667 monitoring violations, and 28 reporting violations.[4] We first consider defendant's motions to dismiss and for summary judgment. In these motions, defendant urges the following bases for dismissal of the entire suit: 1) that defendant's settlement of an enforcement action by the NJDEPE alleging the same violations renders this case moot; 2) that this suit is statutorily precluded by NJDEPE's prior enforcement action; and 3) that this court lacks jurisdiction over some or all of plaintiffs' claims by reason of plaintiffs' failure to adequately allege ongoing violations of the Act as required under § 505 of the Act and the Supreme Court's opinion in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Because we hold that none of these theories warrant dismissal, we will then turn to plaintiffs' motions for partial summary judgment.

## II. *Defendant's Motion to Dismiss*

Defendant moves to dismiss this case as moot, arguing that since defendant has already entered into a settlement agreement with the government under which it paid substantial fines for almost all of the same violations challenged in this suit, the matter has already been resolved, and there is no longer a case or controversy. According to defendant, since the government imposed a penalty that it presumably considered adequate to deter future violations, there is no realistic prospect that those violations will continue, and the case is therefore moot.

It is important to note that this argument is related to but distinct from the argument that plaintiff's suit is *statutorily* precluded by the government's prior enforcement action. The Clean Water Act explicitly provides that citizen suits are precluded in certain circumstances in which prior enforcement action has been taken by the government. *See* 33 U.S.C. §§ 1319(g)(6), 1365(b)(1)(B). The argument that defendant initially rested its motion on, however, is a *constitutional* argument based on the doctrine of mootness stemming from the case or controversy requirement of Article III. In plaintiffs' opposition to the motion to dismiss, they raised the statutory issue, arguing that the government enforcement action in this case was not of a type that triggers the statutory preclusion provision. Although it had not raised this issue before, defendant then proceeded to argue statutory preclusion both in its reply brief to its motion to dismiss, and in its subsequent motion for summary judgment.[5] Accordingly, both issues are before us, and each will be considered separately.

### A. *Constitutional Mootness*

 It is a fundamental proposition that "the availability of damages or other mone-

3. Because defendant relies on submissions outside the pleadings for this motion, technically we must treat it as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). We continue to refer to it as defendant's motion to dismiss simply for the sake of clarity.

4. The numbers of violations cited in plaintiffs original motion were slightly higher, but they have amended their numbers over the course of the litigation. For the numbers cited above, we rely on plaintiffs' exhibits 23A–D, submitted with

their reply brief to their motion for summary judgment.

5. Defendant is partially to blame for this confusion to the extent that it quotes passages from cases discussing the policy rationale behind the *statutory* preclusion provision to back up its *constitutional* mootness argument. *See infra* at 1171. Congress's reasons for including the citizen suit preclusion provisions in the statute are irrelevant to the constitutional question of whether the case is moot.

tary relief almost always avoids mootness." *Jersey Cent. Power & Light Co. v. N.J.*, 772 F.2d 35, 41 (3d Cir.1985) (quoting 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3 at 261 (1984)). Courts have generally treated civil penalties under the Clean Water Act as damages for this purpose, such that even where a claim for injunctive relief is mooted by discontinuance of the challenged illegal conduct, claims for civil penalties survive. *See, e.g., Atlantic States Legal Found. v. Tyson Foods*, 897 F.2d 1128, 1137 (11th Cir.1990); *Pawtuxet Cove Marina v. Ciba–Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir.1986), *cert. denied*, 484 U.S. 975, 108 S.Ct. 484, 98 L.Ed.2d 483 (1987); *Government of the V.I. v. V.I. Paving*, 714 F.2d 283, 284 (3d Cir.1983). *But see Atlantic States Legal Found. v. Pan Am. Tanning Corp.*, 807 F.Supp. 230 (N.D.N.Y. 1992). This position makes sense from a policy standpoint, since the opposite position would encourage polluters to wait until they get sued to take corrective action in compliance with the Act. *Cf. United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case.").

■ This case has an additional twist, however. Here the alleged illegal conduct was not simply discontinued, but penalties have also been paid by the polluter already. Assuming that the fines imposed by the government were sufficient to fulfill the Act's intended deterrence function, the remedy that plaintiff seeks has already been implemented, and thus, defendant argues, their claim for civil penalties is moot.

Defendant cites only one case in which such a rationale has been employed to dismiss a Clean Water Act case on constitutional mootness grounds, *Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124

(2d Cir.1991).[6] There, the defendant entered into negotiations with the state after the citizen suit was filed. Under the settlement agreement that resulted, the defendant agreed to pay 1.4 million dollars in penalties "in full settlement of all civil and administrative claims and liabilities that might have been asserted by [the state] against [the defendant]." *Id.* at 126. The court held that "[i]f the state enforcement proceeding has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence," the citizen suit must be dismissed as moot. *Id.* at 127.

■ We do not find *Kodak* convincing. Its reasoning is based on policy arguments invoking the purposes behind the Clean Water Act, *see id.*, which may be instructive in interpreting the statutory preclusion provisions of the Act itself but are irrelevant to the constitutional mootness issue. To resolve this issue, we need to ask instead whether, after Pennwalt's settlement with the government, there remains a "live" case or controversy such that "adverse parties will vigorously argue the conflicting contentions to the court" and a decision by the court will have an impact on the parties. *Williams v. Shaffer*, 385 U.S. 1037, 1038, 87 S.Ct. 772, 773, 17 L.Ed.2d 683 (1967) (Douglas, J., dissenting); *accord Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); 13A C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 3533 at 212 (1984). Only where it is "impossible for the court to grant 'any effectual relief whatever' to a prevailing party," is a case moot. *Church of Scientology v. United States*, —— U.S. ——, ——, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)).

Here, the positions of the parties are sufficiently adverse to ensure vigorous argument. Even though the defendant has already paid

6. Defendant also cites the Supreme Court's opinion in *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), but that case provides very little, if any, support for defendant's position. *Gwaltney* addressed the entirely distinct issue of the scope of jurisdiction under § 505 of the Act, *see infra* section III, and simply mentioned in passing dicta that citizen suits might in some circumstances become moot in the constitutional sense. The Court made no mention of a prior settlement with the government constituting such a circumstance. *See Tyson Foods*, 897 F.2d at 1134 (interpreting *Gwaltney*'s dicta as addressing the mooting of injunctive relief only).

a penalty, plaintiffs take the position that substantial additional penalties are warranted. If the statute did not allow for the imposition of further penalties over and above the $275,000 already paid under Pennwalt's settlement with NJDEPE, then it would indeed be impossible for the court to grant any effectual relief whatever, and the case would be moot. Here, however, if liability is found for the violations alleged, this court will·have authority under the statute to impose almost sixty million dollars in penalties. *See* 33 U.S.C. § 1319(d) (setting maximum civil penalty per violation at $25,000).

The possibility that substantial additional penalties may be imposed—just like the possibility of penalties where none have yet been paid [7]—creates a sufficient case or controversy to avoid mootness. Even though in this case specific deterrence is impossible since defendant no longer owns the facility, the imposition of additional penalties would fulfill the general deterrence function of penalties under the Act ·and thus provide "effectual relief" to plaintiffs. *See NJPIRG v. Powell Duffryn Terminals*, 913 F.2d 64, 73 (3d Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Accordingly, defendant's motion to dismiss on constitutional mootness grounds is denied.

### B. *Statutory Preclusion*

There are two provisions of the Clean Water Act that bar citizen suits in certain instances where there has been a prior state enforcement action, but defendant only argues that one is applicable here.[8] Section 309(g)(6) provides that a citizens' suit cannot be brought regarding violations "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection." 33 U.S.C. § 1319(g)(6). The provision goes on to state that the bar does *not* apply if, prior to the commencement of the state enforcement action, the citizen plaintiff has provided 60–days notice of the alleged violations pur-

suant to § 505(b)(1)(A) of the Act and if the citizen plaintiff thereafter files suit within 120 days after such notice. *See id.* § 1319(g)(6)(B)(ii).

■ Section 505(b)(1)(A) requires a citizen plaintiff to provide notice of the alleged violations to the EPA, the state, and the potential defendant at least 60 days before filing suit under the Act. *See id.* § 1365(b)(1)(A). In compliance with this provision, plaintiffs sent their 60–day notice letter to Pennwalt, the EPA, and NJDEPE on July 20, 1989; sixty days later they filed the complaint in this action. On March 31, 1989, *before* the 60–day notice, NJDEPE sent a "Compliance Evaluation Inspection Report" to Pennwalt; and on August 31, 1989, *after* the 60–day notice, NJDEPE issued an Administrative Order and Notice of Civil Administrative Penalty Assessment proposing a penalty of $370,250 against Pennwalt. Whether the § 309(g) bar applies to this suit, therefore, turns on the question of which of these actions by NJDEPE constituted a "commencement of an action" under that section.

It is not clear what "commencement" means under the federal statute since it is not defined. Plaintiffs suggest that we take guidance from state regulations that prescribe specific procedures for the institution of a proceeding to assess a civil administrative penalty under the New Jersey Water Pollution Control Act, N.J.Stat.Ann. 58:10A–1 *et seq.* These procedures include service of notice by certified mail or personal service notifying the violator of the charges against her, the amount of penalty to be imposed, and .the right to a hearing. *See* N.J.Admin.Code 7:14–8.3(a). The Compliance Evaluation Inspection Report and cover· letter make no mention of formal charges, penalties, or a hearing, while the Notice of Civil Penalty Assessment issued to Pennwalt on August 31, 1989 complied precisely with these requirements.

Compliance Evaluation Inspections are apparently conducted by NJDEPE on a period-

---

**7.** *See* cases cited *supra* at 1171.

**8.** The other, § 505(b)(1)(B), provides that a citizens' suit cannot be brought if "[a] State has commenced and is diligently prosecuting a civil

or criminal action in a court of the United States, or a State" against the alleged violator. 33 U.S.C. 1365(b)(1)(B). This provision is clearly inapplicable here since NJDEPE never brought a judicial action against Pennwalt.

ic basis, and following each inspection a report is sent to the permit holder giving the facility a rating, such as "conditionally acceptable" or "unacceptable." Plaintiffs have submitted six cover letters sent to Pennwalt with such reports between April 1986 and March 1989. Up until the report of March 31, 1989, Pennwalt had consistently been rated "conditionally acceptable," meaning that some violations of the permit had been found but not enough to warrant an "unacceptable" rating. The March 31, 1989 report rated the facility "unacceptable." The cover letter stated, as did the previous cover letters, "[s]ince the deficiency(ies) cited are presently, or could, in the future, adversely affect effluent quality, you are DIRECTED to institute measures to correct the deficiency(ies)." It went on to state, "[f]ailure to fully comply with the above will result in the initiation of enforcement action by this Department and/or the U.S. Environmental Protection Agency."

The wording of the letter indicated that an enforcement action had not yet been initiated but might be in the future. Moreover, the fact that similar letters were periodically sent to Pennwalt over the years without any formal action having been initiated by NJDEPE adds further weight toward a finding that this letter and the accompanying report did not "commence" an enforcement action. Thus, we view the March 31, 1989 letter and report as simply one in a series of periodic reports from NJDEPE which served to warn defendant that an enforcement action might be initiated in the future. The August 31, 1989 Order and Notice, issued pursuant to state regulations specifically providing for due process protections in the initiation of enforcement proceedings, was the actual initiation or "commencement" of an enforcement proceeding by NJDEPE. *Cf. NJPIRG v. New Jersey Expressway Auth.*, Civ. No. 91–1701, slip op. at 21 n. 13, 1992 WL 479151 (D.N.J. Dec. 3, 1992) (proposed Memorandum of Understanding sent to defendant by NJDEPE, which neither specified a penalty nor advised of right to

hearing, did not constitute "commencement" within meaning of § 309(g)); *Atlantic States Legal Found. v. Koch Refining Co.*, 681 F.Supp. 609, 611 n. 2 (D.Minn.1988) (notice of violation issued by the state did not constitute commencement of a state enforcement action).

Accordingly, since this "commencement" did not occur until after plaintiffs sent their 60 day notice letter, this suit is not subject to § 309(g)'s statutory bar. Defendant's motion to dismiss and its motion for summary judgment on the ground that this suit is barred under § 309(g) of the Act are therefore denied.[9]

## III. Defendant's Motion for Summary Judgment

Defendant's summary judgment motion repeats the mootness and statutory preclusion arguments discussed above. Additionally, it argues that this court lacks jurisdiction over plaintiffs' claims because they are based on "wholly past violations" and therefore barred under § 505(a)(1) of the Act as interpreted by the Supreme Court in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

### A. Gwaltney's Jurisdictional Bar— Generally

In *Gwaltney* the Supreme Court held that the Clean Water Act does not permit citizen suits that are based on "wholly past violations." 484 U.S. at 64, 108 S.Ct. at 384. This holding was based on the language of § 505 of the Act, which is worded in the present tense only, allowing citizen suits against any person "alleged to be in violation" of the Act. 33 U.S.C. § 1365(a).

*Gwaltney* does not require a court to dismiss an otherwise proper suit when the defendant ceases the allegedly illegal conduct during the pendency of the litigation. *See id.* at 66–67, 108 S.Ct. at 385–386; *cf. United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Rather, *Gwaltney* holds that jurisdiction is

---

**9.** Given this holding, we need not reach plaintiff's additional arguments that the administrative penalty provisions in New Jersey law are not "comparable" to the administrative penalty provisions of section 309(g) and that the NJDEPE proceeding was not "diligently prosecuted" within the meaning of § 309(g).

proper under the Clean Water Act as long as a citizen plaintiff is able to make good faith allegations of a continuing likelihood of ongoing violations at the time the suit is filed. *See Gwaltney,* 484 U.S. at 64, 108 S.Ct. at 384. Once such jurisdiction attaches, the court can assess penalties for all current *and* past violations of the Act, even if it is later proved that no violations actually occurred subsequent to the filing of the complaint. *See Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 696 (4th Cir. 1989), *on remand from Gwaltney,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); *PIRG v. Carter–Wallace, Inc.,* 684 F.Supp. 115 (D.N.J.1988).

### B. *Parameter–by–Parameter Analysis under Gwaltney*

■ Defendant argues that in order to establish jurisdiction under *Gwaltney,* plaintiffs must be able to make good faith allegations of ongoing violations as to each parameter separately. Plaintiffs, on the other hand, argue that for purposes of the jurisdictional determination, the permit must be viewed as a whole, such that good faith allegations of ongoing violations of any aspect of the permit will be enough to establish jurisdiction over past and present violations of all parameters. Neither the Supreme Court's opinion nor the language of the statute offer much guidance as to this dispute, and the few lower courts that have addressed it are split.[10] *Compare Chesapeake . Bay Found. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 696 (4th Cir. 1989) (adopting parameter-by-parameter ap-

proach), *on remand from Gwaltney,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); *Allen County Citizens for Env't v. BP Oil Co.,* 762 F.Supp. 733, 739–41 (N.D.Ohio 1991) (explicitly adopting Fourth Circuit's parameter-by-parameter approach)[11] *with NJPIRG v. Yates Indus.,* 790 F.Supp. 511, 515–16 (D.N.J.1991) (rejecting parameter-by-parameter approach); *Sierra Club v. Port Townsend Paper Corp.,* 28 Env't Rep.Cas. (BNA) 1676, 1678, 1988 WL 160580 (W.D.Wash. 1988) (same). *Cf. Natural Resources Defense Council v. Texaco Ref. & Mktg.,* 800 F.Supp. 1, 11 (D.Del.1992) (adopting compromise approach).

Defendant relies primarily on the Fourth Circuit's decision in the *Gwaltney* case itself after remand from the Supreme Court. There the court treated violations of the discharge limitations for chlorine and "total Kjeldahl nitrogen" separately for purposes of determining jurisdiction. Because it was "absolutely clear" that there were no ongoing chlorine violations at the time the suit was brought, the Fourth Circuit held that the there was no subject matter jurisdiction over the chlorine related claims. *Gwaltney,* 890 F.2d at 697. The court expressly rejected the idea that the permit should be viewed as a whole in determining whether violations are ongoing for purposes of jurisdiction. *See id.* at 698. In doing so, the court looked to the language of the citizen suit provision of the statute, which states that a citizen may bring suit against any person "who is alleged to be in violation of *an effluent standard or limitation."* 33 U.S.C. § 1365(a) (emphasis

---

**10.** The Third Circuit has not taken a position on this issue. Defendant cites one case from the District of New Jersey, but it is not clear that this case really supports defendant's position. *NJPIRG v. Yates Indus.,* 757 F.Supp. 438 (D.N.J. 1991). In discussing whether silver monitoring violations are subject to the *Gwaltney* jurisdictional bar, that court appeared to endorse the parameter-by-parameter approach because it looked at plaintiffs' allegations as to ongoing violations of that parameter alone in determining that the bar did not apply. The court did not explicitly identify or address the issue, however. In a later opinion in the same case, *NJPIRG v. Yates Indus.,* 790 F.Supp. 511 (D.N.J.1991), the court did squarely address the issue, and this time clearly held that a parameter-by-parameter evaluation of ongoing violations is *not* required to satisfy *Gwaltney.*

We hold that evidence of violations in some parameters is admissible as evidence that future violations are likely in other parameters, thus satisfying the requirements of *Gwaltney,* particularly where, as is the case here, numerous parameters have been violated on many occasions since the filing of the suit.

*Id.* at 515–16.

**11.** Defendant also cites *Ark. Wildlife Found. v. Bekaert Corp.,* 791 F.Supp. 769, 780 (W.D.Ark. 1992). That case, however, can be read to simply hold that a parameter-by-parameter approach should be taken by the court in assessing penalties, but not in applying *Gwaltney* 's jurisdictional bar. *See also Natural Resources Defense Council v. Gould, Inc.,* 733 F.Supp. 8 (D.Mass.1990).

added). The court concluded that this language evidenced an intent that each "effluent standard or limitation" (i.e. parameter) should be considered separately for purposes of jurisdiction. *See Gwaltney*, 890 F.2d at 698.

In our view, however, this language is susceptible to more than one interpretation. It can also be read to mean that as long as there are ongoing violations of just one parameter ("*an* effluent standard or limitation") a citizen may bring suit under the Act. Moreover, as plaintiffs point out, the phrase "effluent standard or limitation" does not necessarily refer to an individual parameter. Rather, it is defined in the statute to include "a permit or condition thereof." 33 U.S.C. § 1365(f).

Examining this dispute from a policy standpoint does not yield an obvious answer either. On one hand, a rule that allows plaintiffs to use an ongoing violation of just a single parameter to bootstrap long past and unrelated violations into a lawsuit may undercut the *Gwaltney* requirement that citizen suits challenge only present ongoing violations of the Act. On the other hand, a facility's tendency to violate a number of different parameters may often be related to the same underlying cause. As the *Texaco* court pointed out,

> If ... violations are related to the [same] basic underlying problem, the fact that past violations show up in one parameter and a post complaint violation occurs in a different parameter should not ... deprive us of jurisdiction in a citizen's suit to grant a remedy for what is essentially the same inadequately resolved source of difficulty.

*Texaco*, 800 F.Supp. at 14.

A wooden application of the parameter-by-parameter approach at the outset of a case, before evidence as to the underlying causes of the alleged violations had been adduced, could thus result in the court losing jurisdiction over violations that are in fact caused by an ongoing problem. In view of this concern, the *Texaco* court struck a compromise, holding that, while violations of the permit as a whole would be sufficient to establish jurisdiction at the outset of the suit, at trial plaintiffs would have to prove that violations of each parameter, whether past or present, were caused by an ongoing problem. *See id.* at 14–15. They could do this either by demonstrating that violations of the specific parameter continued after the filing of the complaint, or by showing that the underlying cause of violations with respect to a certain parameter remains unsolved even though no actual violations of that parameter have occurred since the filing of the complaint. The court fashioned a fairly lenient standard for plaintiffs, holding that jurisdiction would be established with respect to a parameter unless the risk of further violation had been "completely eradicated" at the time the complaint was filed. *Id.* at 15.

We find both the defendant's position and the *Texaco* court's compromise approach problematic. One purpose of the Clean Water Act was to streamline the enforcement process by avoiding the necessity of lengthy fact finding proceedings. *See* S.Rep. No. 414, 92d Cong., 1st Sess. 64, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3730. The parameter-by-parameter approach— whether conducted at the outset of the suit or at trial—requires a particularized and fact-intensive inquiry, especially if we attempt to account for underlying causes in determining which violations are "ongoing," as the *Texaco* court wisely suggests. This cumbersome analysis is antithetical to that statutory purpose.

The jurisdictional inquiry envisioned by the Supreme Court in *Gwaltney* was quick and cursory, not the kind of precise, fact-intensive inquiry that the parameter-by-parameter approach requires. The opinion makes clear that district courts need not look behind the good faith allegations of the complaint at any stage of the proceedings to establish jurisdiction.[12] *See Gwaltney* 484 U.S. at 68, 108 S.Ct. at 387 (Scalia, J. concurring) ("plaintiff can never be called on to

---

12. The case had already proceeded through summary judgment and trial when it reached the Supreme Court, but the Court explicitly instructed the lower court to determine on remand whether the complaint contained a good faith *allegation* of ongoing violation, not whether violations were in fact ongoing when the complaint was filed.

prove [her] jurisdictional allegation"). Given that the Supreme Court did not find it necessary to make the jurisdictional requirement so stringent and precise as to require a factual determination of whether violations were ongoing, we find it unlikely that the court envisioned the jurisdictional question as requiring the particularized factual inquiry that is necessary under the parameter-by-parameter approach.

 Moreover, the concern that plaintiffs might circumvent the jurisdictional requirement under the other approach by using an ongoing violation of a single parameter to open up and litigate long past violations of unrelated parameters is, in our view, overstated. We suspect the instances are rare in which violations of one parameter have a cause entirely unrelated to other parameters. *See Texaco,* 800 F.Supp. at 14. In addition, even in cases where past violations are completely unrelated, once jurisdiction over past and ongoing violations of a single parameter has been established, the added burden on the defendant of litigating past violations of other parameters as well will in most instances be minimal, since the DMRs and other documents that must be produced in discovery will be the same. Moreover, where the underlying problem that caused past violations has in fact been solved, any request for injunctive relief will be moot and the penalties imposed by the court will probably be minimal. In determining the amount of penalty to be imposed, the court must consider the defendant's good faith efforts to comply, *see* 33 U.S.C. § 1319(d), as well as the necessity for specific deterrence, *see NJPIRG v. Powell Duffryn Terminals,* 913 F.2d 64, 73 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). With respect to unrelated past violations, such considerations would compel a minor penalty.

Therefore, we reject both the *Texaco* Court's compromise approach and the defendant's position in favor of a jurisdictional analysis that views the permit as a whole, allowing good faith allegations of ongoing violations as to any one parameter to establish jurisdiction over all past and present permit violations. Accordingly, because the DMRs and other documents submitted by plaintiffs indicate that some violations of the permit occurred subsequent to the filing of the complaint, we hold that § 505's jurisdictional requirement is satisfied. Defendant's motion for summary judgment on this ground is denied.

**IV. *Plaintiff's Motions for Summary Judgment***

Plaintiffs have filed two motions for summary judgment which are both presently before us. The first, filed in October 1992 seeks summary judgment as to liability on 1,685 alleged discharge violations, 667 alleged monitoring violations, and 28 alleged reporting violations. The second, filed on February 26, 1993, seeks summary judgment as to liability with respect to three additional alleged discharge violations, which plaintiffs assert they were unaware of until after filing their first motion.[13] Because the legal issues raised by the parties with respect to both motions are identical, we will address them simultaneously.

Pennwalt opposes plaintiff's motions for summary judgment on the following grounds: 1) that plaintiffs lack standing because they cannot show that their injury is likely to be redressed by a favorable decision; 2) that evidence of laboratory error creates a genuine issue of material fact with respect to many alleged violations; 3) that there are genuine issues of material fact with respect to the 756 composite sampling violations alleged by plaintiffs; 4) that plaintiffs' list of alleged violations is replete with obvious factual errors; and 5) that plaintiffs improperly inflated the total number of violations by counting each violation of a "monthly average" discharge limitation as 28–31 separate violations for each day of the month rather than as a single violation.

**A. *Standing***

 The constitutional requirement of standing is satisfied where: 1) plaintiff has

---

**13.** These three excursions occurred as a result of a single discharge of an estimated 72,000 gallons of partially treated waste water on July 27, 1990.

personally suffered an actual or threatened injury; 2) the injury can be fairly traced to the challenged action; and 3) the injury is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). To establish standing, plaintiffs have submitted four affidavits of individual members of their organizations who own property near the Delaware River and who engage in recreational activities such as hiking, jogging, canoeing, bird watching, boating, and fishing on the river downstream from defendant's discharges. They complain of the smell and appearance of the river and state that they would swim in and eat fish from the river if it were not so polluted.

■■■ Defendant challenges plaintiffs' standing in this case only under the third prong of the *Valley Forge* test: redressability. Even where injunctive relief is not sought, as in this case, courts have repeatedly held that the imposition of civil penalties in and of itself is likely to redress plaintiffs' injuries by providing a deterrent against further violations by the particular defendant as well as other permit holders. *See Powell Duffryn,* 913 F.2d at 73; *PIRG v. Star Enterprise,* 771 F.Supp. 655, 664 (D.N.J.1991); *SPIRG v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1200–01 (D.N.J.1985). Here, however, defendant argues that any deterrence of future illegal discharges that might be gained by the imposition of civil penalties has already been effectuated by the penalties imposed by its settlement with NJDEPE. In other words, if we reach the penalty phase of this case, we will conclude that no further penalties are needed to effectuate the deterrence function of the statute because of the penalties already paid. Therefore, defendant argues, plaintiffs' injury is not likely to be redressed by a favorable decision.

■■■ Defendant misreads the redressability requirement. Plaintiffs need not show that they are likely to receive a favorable decision, but rather that, assuming a decision favorable to plaintiffs, the relief available would be likely to redress their injuries. Thus, our analysis here is similar to that

under the mootness doctrine. Certainly, if the maximum amount of civil penalties available if plaintiffs prevailed were less than or equal to the $275,000 already paid by defendant in its settlement with NJDEPE, we would conclude that no redress was likely since no further penalties could be imposed. Here, however, where plaintiffs have alleged a total of 2,383 violations, the maximum penalty available under the statute would be close to sixty million dollars. Thus, a decision favorable to plaintiffs would be one that imposed further penalties above those already paid by defendant. The imposition of such penalties would result in further deterrence against future violations by other violators and thereby provide redress to plaintiffs. *See Powell Duffryn,* 913 F.2d at 73. Therefore, we hold that plaintiffs have standing to bring this action.

**B. Discharge Violations—Evidence of Laboratory Error**

Plaintiffs have submitted copies of Pennwalt's DMRs and laboratory reports, which they contend demonstrate that defendant committed all of the permit violations alleged. Defendant, however, contends that most or all of the discharge violations reflected in these documents were the result of laboratory error. It has submitted evidence that it contends establishes a sufficient dispute on this question to defeat summary judgment.

■■■ It is well-established that DMRs and laboratory reports may be relied on in Clean Water Act cases to establish liability on summary judgment. *See, e.g., United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (defendant's report of oil spill compiled in compliance with Clean Water Act could be used to establish liability for civil penalties under Act); *PIRG v. Rice,* 774 F.Supp. 317, 325 (D.N.J.1991) (DMRs, laboratory reports, and supplemental operating logs showing violations of NPDES permit used to establish liability under Clean Water Act); *PIRG v. Yates Indus.,* 757 F.Supp. 438, 447 (D.N.J.1991) (DMRs); *PIRG v. GAF Corp.,* No. 89–2283, transcript at 26–27 (D.N.J., Nov. 20, 1990) (DMRs); *SPIRG v. Jersey Cent. Power & Light Co.,* 642 F.Supp.

103 (D.N.J.1986) (DMRs and non-compliance reports); *SPIRG v. P.D. Oil & Chem. Storage, Inc.,* 627 F.Supp. 1074, 1090 (D.N.J. 1986) (DMRs); *SPIRG v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1429 (D.N.J.1985) (DMRs). *But see Friends of the Earth v. Facet Enterprises,* 618 F.Supp. 532, 536 (W.D.N.Y.1984) (defendant's "multitude of justifications for the alleged violations, along with convincing argument why many ... should not actually constitute violations (e.g. typographical mistakes in the DMRs)" sufficient to defeat summary judgment). "[T]here can be no question that the data disclosed in [a] defendant's DMRs may be accepted as true." *Georgia–Pacific,* 615 F.Supp. at 1429.

■■■ Thus, if a defendant wishes to contest the accuracy of its DMRs, it "has a heavy burden to establish faulty analysis." *Id.* The "defendant must present direct evidence of reporting inaccuracies" and "may not rely on unsupported 'speculation' of measurement error." *Id.* Defendant must show "that there were errors in the actual tests performed." *SPIRG v. Tenneco Polymers,* 602 F.Supp. 1394, 1400 (D.N.J.1985). Apparently, no court in this district has thus far found a defendant to have met this heavy burden. *See NJPIRG v. Magnesium Elektron, Inc.,* 34 Env't Rep. Cas. (BNA) 2077, 2084, 1992 WL 16314 (D.N.J.1992) (defendant's challenge to protocol used by lab in testing for one parameter inadequate to defeat summary judgment where EPA specifically approved that protocol); *Yates,* 757 F.Supp. at 447 (defendant's submission of cover letters originally submitted to government with DMRs in which defendant stated that it "believed" the discharge violations were due to testing errors too speculative to defeat plaintiff's summary judgment); *Tenneco Polymers,* 602 F.Supp. at 1400 (expert's affidavit asserting testing procedures generally inaccurate, insufficient to defeat summary judgment).

■■■ This "heavy burden" imposed on defendants seeking to prove laboratory error is consistent with one of the purposes behind the Act as reflected in the legislative history.

[T]he bill ... establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these requirements is to avoid the necessity of lengthy fact finding [and] investigations ... at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.

S.Rep. No. 414, 92d Cong., 1st Sess. 64, *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3730. *See also* 44 Fed.Reg. 3263 (June 7, 1979) ("Congress intended that prosecution for permit violations be swift and simple"). The Act achieves this purpose of streamlining the fact finding process in two ways. First, it places the burden of measuring and reporting pollutant levels on permit holders. Enforcement is thus made easy and inexpensive since evidence of violations must be compiled and documented by the permit holders themselves. Secondly, the Act imposes strict liability for permit violations such that a court need not enquire into a defendant's culpability or good faith in order to find liability. *See Stoddard v. Western Carolina Regional Sewer Auth.,* 784 F.2d 1200, 1208 (4th Cir.1986); *United States v. Earth Sciences,* 599 F.2d 368, 374 (10th Cir. 1979); *P.D. Oil & Chem.,* 627 F.Supp. at 1090. Thus, establishing liability is simply a matter of compiling the records that permit holders are required to keep; where these records show permit violations to have occurred, liability can usually be established at summary judgment.

In keeping with this scheme of streamlining the enforcement process by placing responsibility for monitoring and reporting on permit holders and imposing strict liability, a cogent argument can be made that evidence of laboratory error, no matter how strong, simply does not constitute a defense to claims of discharge violations. One court in the District of Connecticut has taken this position, reasoning that the laboratory error defense

conflicts with the basic notion of strict liability in [Clean Water Act] enforcement.... Congress did not intend the courts to be the forums for determining the adequacy or inadequacy of scientific

measurements, just as it did not intend the courts to be the forum to decide the assessment of effluent limitations and schedules of compliance. Defendant was required to monitor its discharges, 40 C.F.R. § 122.41(j), and attest to the accuracy of its reports, 40 C.F.R. § 122.22(d).... It may not now refute its own report on the results of its testing.

*Connecticut Fund for Env't v. Upjohn Co.,* 660 F.Supp. 1397, 1417 (D.Conn.1987) (citations omitted). *See also Chesapeake Bay Found. v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 452 (D.Md.1985) ("Given the heavy emphasis on accuracy in the Act and the clear Congressional policy that DMRs should be used for enforcement purposes, the court will not accept claims of inaccurate monitoring as a defense"). Moreover, to the extent we allow permit holders to escape liability by proving laboratory error after the fact, we create an incentive for them to wait until they are sued before taking steps to ensure that their laboratory results and DMRs are accurate.

 We agree with the Connecticut court that the Act places the burden of accurately monitoring the levels of pollutants in their effluent squarely on the shoulders of permit holders, and that we must hold them to that obligation.[14] To the extent that a permit holder hires a laboratory that produces inaccurate and unreliable test results, the permit holder has failed to fulfill its monitoring requirement in direct violation of the Act. Erroneous laboratory results yield the same result as if no monitoring had been performed at all; the government, citizen-plaintiffs, and the courts have no way of knowing whether discharge violations have occurred or not.[15]

 Clearly, where a permit holder fails to monitor for a given pollutant as required under its permit, it can be held liable for a monitoring violation. *See NJPIRG v. GAF Corp.,* 770 F.Supp. 943, 954 (D.N.J. 1991). Similarly, where the permit holder—or the laboratory it hires—performs the monitoring function improperly so as to produce unreliable results, it has violated the Act. Because the Act imposes strict liability, a defendant's protestations that errors committed by the laboratory are not the defendant's "fault" will be unavailing. Thus, while we agree with the Connecticut court that it is inconsistent with the structure and purpose of the Act to allow permit holders to escape liability altogether on the basis of laboratory error, we find it more accurate, where laboratory error has been shown, to hold a defendant liable for a monitoring violation rather than a discharge violation.

 While this may seem a pyrrhic victory for defendant, we expect that this distinction will in most cases be significant at the penalty phase. In determining the amount of a civil penalty, the statute explicitly directs us to consider "any good-faith efforts to comply with the applicable requirements," as well as "the seriousness of the

---

**14.** The permit also requires permit holders to vouch for the accuracy of the data they report by making the following certification when signing their DMRs:

> I certify under penalty of law that I have personally examined and am familiar with the information submitted in this document and all attachments and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.

**15.** Even direct proof that laboratory results are erroneous does not necessarily prove that a discharge violation did not occur. Certainly, where a sample has been split three ways and two of the three laboratories report pollutant levels be-

low the permit limits, we can infer that it is more likely than not that a violation did not occur. Where two-way split sampling produces generally divergent results, but no pattern of one laboratory's results being consistently higher than another's can be discerned, however, we can only conclude that the laboratory's results are inaccurate. We have no way of knowing whether the errors produced more or fewer apparent violations of the permit than in fact occurred. This puts us in essentially the same position as if no monitoring had been conducted at all.

Here, three-way sampling cast doubt on three of the discharge violations reported by NET, and plaintiffs have conceded that they are not entitled to summary judgment as to these three alleged violations. In general, however, the split sampling results show no consistent pattern that would indicate to us that NET consistently erred in one direction or the other.

violation." 33 U.S.C. § 1319(d). As a general matter, discharge violations will be considered more "serious" than monitoring violations.[16] *See Yates*, 757 F.Supp. at 454 (reporting and monitoring violations do not "produce the kind of direct environmental impact" that is the primary target of the Act). Thus, we hold that laboratory error is a partial defense to liability under the Act. In other words, defendants can, by submitting sufficient credible evidence of laboratory error, defeat liability for discharge violations. For each measurement required under the permit as to which the laboratory's results are proved erroneous, however, defendant will be held liable for a monitoring violation.

■ Accordingly, the question remaining is whether the evidence of laboratory error submitted by defendant in this case is sufficient to defeat plaintiffs' motion for summary judgment as to liability for discharge violations. Certainly, as to those violations where split sampling produced one result that was within the applicable permit limitation, we must conclude that there is a genuine issue of material fact and thus deny summary judgment.[17] *See Int'l Union, United Auto. v. Amerace Corp.*, 740 F.Supp. 1072, 1084 n. 13 (D.N.J.1990). Defendant, however, also asks us to infer, based on evidence of faulty laboratory procedures and erroneous results in 1989 and 1990, that all of the discharge violations recorded in the DMRs from as far back as 1985 are based on erroneous laboratory results.

Is this a reasonable inference which must be drawn in favor of defendant as the non-moving party, *see Country Floors v. Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir.1991),

or does such an inference constitute mere speculation within the meaning of the cases discussed above? Defendant has clearly submitted more substantial evidence of inaccuracies, even with respect to pre–1989 measurements, than was offered in any of the other cases in this district in which the laboratory defense was rejected.[18] Except for the few instances noted above,[19] however, defendant has not submitted "direct evidence" of errors in the "actual tests performed," if that is construed to mean specific proof as to each individual test.

■ All of the evidence as to laboratory error in tests performed prior to September 1989 is clearly circumstantial. That fact alone, however, does not render it insufficient or unreliable. *See* 1A Wigmore on Evidence § 26 (1983). Given that criminal defendants can be proved guilty beyond a reasonable doubt on the basis of circumstantial evidence alone, we cannot say that circumstantial evidence is per se insufficient to meet a Clean Water Act defendant's burden to show laboratory error. While we recognize that defendant has a heavy burden to establish laboratory error, *see Georgia–Pacific*, 615 F.Supp. at 1429, we find the evidence submitted by defendant in this case sufficient, at least at summary judgment, to meet that burden.

First, defendant has submitted the results of split sampling conducted over a six month period from September 1989 through February 1990, showing numerous divergences between measurements obtained by NET and the other laboratories. Second, defendant has submitted the reports of two independent audits of NET's laboratory conducted in February 1990, both of which identified defi-

---

16. This is not to say that a monitoring violation can never be serious. Where, for example, a monitoring violation arises from a defendant's bad faith effort to circumvent the requirements of the Act, it could conceivably warrant the strictest penalty.

17. Our examination of the record indicates that with respect to five of the violations alleged by plaintiff, parallel testing by the other laboratory produced results that did not constitute a violation. These are numbers 107, 114, 117, 118, and 119 of plaintiffs' exhibit 23A. *See* Defendant's exhibit 5.

Additionally, defendant has submitted direct evidence of laboratory error with respect to two

lead violations alleged to have occurred in June and July 1986. A letter dated August 18, 1986 from a "Metals Supervisor" at NET to Pennwalt acknowledges that the results finding significant amounts of lead in those samples were inaccurate due to a testing error, and that a rerun of the samples showed the lead levels to be undetectable (less than 2.0 mg/kg). *See* Defendant's exhibit 8. This effects violations # 23 and # 26 of plaintiffs' exhibit 23A.

18. *See supra* at 1178.

19. *See supra* note 17.

ciencies in the laboratories operations. Third, defendant has submitted the EPA's report on NET's performance in a DMR Quality Assurance Program conducted in July 1989. Under this program, the EPA provided samples with known concentrations of various parameters to the laboratory for testing in order to gauge the laboratory's accuracy. For nine out of the ten parameters analyzed by NET, EPA gave the laboratory a rating of "not acceptable," meaning that its measurements were beyond the acceptable range of error.

While none of this constitutes direct evidence of laboratory error for most of the violations alleged, it does indicate that on every occasion when NET's procedures were examined they were consistently found to be below acceptable standards. Viewing this evidence as a whole, we hold that a reasonable jury could find that all of the discharge violations measured by NET, from 1985 through 1990 were based on erroneous laboratory results. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Therefore, plaintiffs' motion for summary judgment as to liability is denied as to all discharge violations alleged to have occurred while defendant was using NET to test its samples.

■ Three discharge violations are alleged to have occurred after February 1990, when Pennwalt stopped contracting with NET: violations of the permit limits for pH, zinc, and total fluorides on July 27, 1990. Because all three of these excursions occurred simultaneously as a result of a single operational upset in which 72,000 gallons of partially treated waste water were discharged, we must under the statute treat it as a single violation. 33 U.S.C. § 1319(d). Therefore, summary judgment is granted in

favor of plaintiff as to liability for one discharge violation on July 27, 1990.[20]

### C. *Monitoring Violations—Composite Sampling Errors*

Pennwalt's permit required it to perform "composite sampling" at outfall 001 on five different parameters. A "composite sample" is a sample that is created by combining a series of individual samples collected at periodic intervals over the entire discharge day. Where discharge is continuous, the permit required a composite sample to be made up of at least twenty-four individual samples collected at hourly intervals.

■ Plaintiffs have submitted a document produced by defendant entitled "Waste Water Sampling Procedure" dated November 18, 1986. This document describes a procedure for composite sampling that requires less frequent collection of samples than is required by the permit. Plaintiffs have also submitted a performance audit of defendant's facility performed by the EPA on February 5, 1990, which states defendant was taking samples for composite sampling on that date less frequently than the permit required. Plaintiffs contend that we can infer, based on these documents, that defendant violated its permit every time it was required to perform composite sampling between November 18, 1986, when the "Waste Water Sampling Procedure" document was issued, and February 1990 when the EPA audit was performed. This amounts to a total of 574 monitoring violations.[21]

In opposition, defendant has submitted an affidavit by an engineer who was responsible for the start up of Pennwalt's waste water treatment system in 1985. She states that an automatic composite sampler was installed in the system and that it was calibrated to compile samples at hourly intervals in com-

20. Because we are denying summary judgment as to all of the alleged discharge violations relating to monthly average discharge limitations, we need not reach the dispute between the parties as to how such violations should be counted.

21. Plaintiffs initially sought summary judgment on 756 composite sampling violations, arguing that their evidence showed that an improper procedure was used from the beginning of the

facility's operations in August 1985 through February 1990. They subsequently acknowledged that there were disputed issues of material fact as to the 182 alleged violations occurring prior to November 18, 1986 (the date of the "Waste Water Sampling Procedure" document), and thus amended their motion to seek summary judgment as to only 574 composite sampling violations.

pliance with Pennwalt's permit.[22] Again, drawing all inferences in favor of the non-moving party, we find that the engineer's affidavit raises an inference that the automatic sampler performed all of the composite sampling required during the period in question, and that it did so at hourly intervals as required by the permit. Therefore, defendant's submission raises a genuine issue of fact as to whether or not composite samples were taken in accordance with permit requirements, and plaintiffs' motion for summary judgment must be denied as to these alleged violations.

Plaintiffs have moved for summary judgment as to a total of 667 alleged monitoring violations.[23] Of these, 574 are composite sampling violations as to which we are denying summary judgment for the reasons set forth above. We grant summary judgment to plaintiffs as to three monitoring violations based on the EPA's audit of February 5, 1990, which indicated that the correct procedures for testing for the pH, temperature, and oil and grease parameters were not followed on that day.[24] We also grant summary judgment as to 63 monitoring violations documented by plaintiffs and as to which defendant has raised no specific objection.[25]

### D. *Reporting Violations—Clerical Errors*

Defendant contends that plaintiff committed clerical errors with respect to fifteen of the violations originally alleged, and that these violations are simply not supported by the DMRs and other documents. Plaintiffs admit error as to eleven violations[26] but contest it as to four reporting violations. We find in plaintiffs' favor as to three of these contested violations but deny summary judgment as to the fourth.

Defendant argues that plaintiffs erred in alleging two reporting violations relating to the pH parameter in October 1985. An examination of the DMR and lab reports for that month,[27] however, indicates that at least two reporting violations were committed. The maximum pH level allowed by the permit was 9.0. The laboratory reported pH levels in excess of that limit on two days in October: a measurement of 10.17 on October 8, and a measurement of 9.05 on October 20. First, the DMR for October reports a maximum pH of 10.1 instead of 10.17. Secondly, the box marked "No. Ex.," in which the permit holder is to indicate the number of excursions for pH that month, was left blank; it should have reported two excursions. Accordingly, plaintiffs' motion for summary judgment will be granted with respect to these two reporting violations.

Defendant also contests plaintiffs' allegation that defendant committed a reporting violation relating to the fluoride parameter in November 1989. Again, an examination of the record indicates that there was at least one reporting violation. In a cover letter to the DMR for that month, Pennwalt admitted two fluoride discharge violations, yet in the box indicating the number of excursions for fluoride, a zero was recorded. Accordingly, plaintiffs' motion for summary judgment will be granted with respect to this reporting violation.

Finally, defendant contests plaintiffs' allegations that defendant committed a reporting violation relating to the lead parameter in October 1989.[28] Because the xerox of the October 1989 DMR submitted by defendant and relied on by plaintiff is illegible,[29] we cannot make a determination as to this allegation. Summary judgment as to this reporting violation will therefore be denied.

22. *See* Defendant's exhibit 18.

23. *See* Plaintiffs' exhibits 23C & D.

24. Plaintiffs claim 28 monitoring violations for the failure to properly test for pH, but do not explain how their evidence that the procedure was not properly followed on one day supports a finding of liability as to 28 violations. *See* Plaintiffs' exhibit 23D, # 6. Accordingly, we count only one violation for pH monitoring.

25. *See* Plaintiffs' exhibit 23C.

26. *See supra* note 4.

27. *See* Defendant's exhibit 23.

28. *See* Plaintiffs' exhibit 23B, # 28.

29. *See* Defendant's exhibit 30, p. 354.

Summary judgment as to the remaining reporting violations, with respect to which defendant has raised no specific objection, will be granted. Thus, summary judgment will be granted as to a total of 27 reporting violations.[30]

## V. *Conclusion*

Because we hold that this case is not moot and is not barred under § 309(g) of the Act, we deny defendant's motion to dismiss. For the same reasons and because we hold that the good faith allegations of ongoing violations of the Act contained in plaintiffs' complaint are sufficient to establish this court's jurisdiction under § 505 of the Act and the Supreme Court's opinion in *Gwaltney*, defendant's motion for summary judgment is denied. Finally, plaintiffs' motion for summary judgment as to liability is granted in part and denied in part. It is granted as to one discharge violation resulting from the excursions of pH, zinc, and total fluorides on July 27, 1990. It is also granted as to 66 monitoring violations and as to 27 reporting violations. With respect to all other alleged violations, summary judgment is denied.

The accompanying order has been entered.

## ORDER

This matter having come before the court on defendant's motion to dismiss, defendant's motion for summary judgment, and plaintiffs' two motions for summary judgment as to liability; the court having considered the submissions and the written and oral arguments of the parties; and for good cause shown;

It is, this 31st day of March 1993, hereby ORDERED that:

1) Defendant's motion to dismiss is DENIED;

2) Defendant's motion for summary judgment is DENIED;

3) Plaintiffs' motion for summary judgment as to liability is GRANTED IN PART AND DENIED IN PART. Defendant is held liable for one discharge violation, as set forth in Appendix A attached hereto; 66 monitoring violations, as set forth in Appendices B & C attached hereto; and 27 reporting violations, as set forth in Appendix D attached hereto. Plaintiffs' motion is denied as to all other alleged violations.

## APPENDIX A

### Discharge Violations

| Violation Number | DMR Period | Discharge Parameter | Permit Amount | Measured Value | Number Violations |
|---|---|---|---|---|---|
| 121–123 | 7/90 | pH, zinc, fluorides | 6.0 S.U. 0.6 mg/1 100 mg/1 | 3.1 S.U. 0.67 mg/1 832.6 mg/1 | 1 |

**30.** *See* Plaintiffs' exhibit 23B.

## APPENDIX B

PENNWALT CHEMICAL CORPORATION
CHRONOLOGICAL LISTING OF MONITORING VIOLATIONS

| Violation number | Monitoring period | Outfall number | Parameter not sampled | Required monitoring | Number of violations |
|---|---|---|---|---|---|
| 1 | 9/85 | 001 | TOC | 1/mo | 1 |
| 2 | 9/85 | 001 | TSS | 1/wk | 1 |
| 3 | 9/85 | 001 | TDS | 1/wk | 3 |
| 4 | 9/85 | 001 | FLUORIDE | 1/wk | 1 |
| 5 | 9/85 | 001 | ARSENIC | 1/mo | 1 |
| 6 | 9/85 | 001 | CHROMIUM | 1/mo | 1 |
| 7 | 9/85 | 001 | COPPER | 1/mo | 1 |
| 8 | 9/85 | 001 | ZINC | 1/mo | 1 |
| ~~9~~ | ~~9/85~~ | ~~001~~ | ~~TDC~~ | ~~1/wk~~ | ~~3~~ |
| 10 | 9/85 | 001 | OIL & GREASE | 1/mo | 1 |
| 11 | 9/85 | 001 | BOD | 1/mo | 1 |
| 12 | 10/85 | 001 | TDS | 1/wk | 1 |
| 13 | 11/85 | 001 | pH | 1/day | 1 |
| 14 | 12/85 | 001 | pH | 1/day | 1 |
| 15 | 1/86 | 001 | TSS | 1/wk | 1 |
| 16 | 1/86 | 001 | TDS | 1/wk | 1 |
| 17 | 1/86 | 001 | FLUORIDE | 1/wk | 1 |
| ~~18~~ | ~~6/86~~ | ~~001~~ | ~~TSS~~ | ~~1/mo~~ | ~~1~~ |
| ~~19~~ | ~~6/86~~ | ~~001~~ | ~~TDS~~ | ~~1/mo~~ | ~~1~~ |
| ~~20~~ | ~~6/86~~ | ~~001~~ | ~~FLUORIDE~~ | ~~1/mo~~ | ~~1~~ |
| 21 | 9/86 | 001 | TOC | 1/mo | 1 |
| 22 | 1/87 | 001 | ZINC | 1/mo | 1 |
| 23 | 2/87 | 001 | TSS | 1/wk | 1 |
| ~~24~~ | ~~3/87~~ | ~~001~~ | ~~FLUORIDE~~ | ~~1/qtr~~ | ~~1~~ |
| 25 | 4–6/87 | 001 | BIOASSAY | 1/qtr | 1 |
| 26 | 6/87 | 001 | pH | 1/day | 3 |
| 27 | 7/87 | 001 | pH | 1/day | 4 |
| 28 | 8/87 | 001 | pH | 1/day | 4 |
| 29 | 9/87 | 001 | pH | 1/day | 3 |
| 30 | 10/87 | 001 | pH | 1/day | 2 |
| ~~31~~ | ~~10/87~~ | ~~002~~ | ~~OIL & GREASE~~ | ~~1/mo~~ | ~~2~~ |
| 32 | 12/87 | 001 | pH | 1/day | 1 |
| 33 | 1/88 | 001 | BOD | 1/mo | 1 |
| 34 | 1/88 | 001 | TOC | 1/mo | 1 |
| 35 | 1/88 | 001 | OIL & GREASE | 1/mo | 1 |
| 36 | 2/88 | 001 | pH | 1/day | 1 |
| 37 | 7/88 | 001 | CHROMIUM | 1/mo | 1 |
| 38 | 7/88 | 001 | COPPER | 1/mo | 1 |
| 39 | 7/88 | 001 | ZINC | 1/mo | 1 |
| 40 | 7/88 | 001 | ARSENIC | 1/mo | 1 |
| 41 | 7/88 | 001 | LEAD | 1/mo | 1 |
| 42 | 7–9/88 | 002 | FLUORIDE | 1/qtr | 1 |
| ~~43~~ | ~~9/88~~ | ~~001~~ | ~~OIL & GREASE~~ | ~~1/mo~~ | ~~1~~ |
| 44 | 12/88 | 001 | pH | 1/day | 2 |
| 45 | 2/89 | 001 | ZINC | 1/mo | 1 |
| 46 | 2/89 | 001 | COPPER | 1/mo | 1 |
| ~~47~~ | ~~4–6/89~~ | ~~001~~ | ~~BIOASSAY~~ | ~~1/qtr~~ | ~~1~~ |
| 48 | 4/89 | 001 | LEAD | 1/mo | 1 |
| 49 | 5/89 | 001 | TDS | 1/wk | 1 |
| 50 | 5/89 | 001 | TSS | 1/wk | 1 |
| 51 | 5/89 | 001 | FLUORIDE | 1/qtr | 1 |
| 52 | 6/89 | 001 | pH | 1/day | 1 |
| 53 | 7/89 | 001 | pH | 1/day | 2 |
| 54 | 8/89 | 001 | pH | 1/day | 1 |
| 55 | 9/89 | 001 | pH | 1/day | 1 |
| 56 | 4/90 | 001 | TSS % REM | 1/wk | 1 |

Total violations ~~74~~ 63

#### TABLE OF ABBREVIATIONS

| | |
|---|---|
| BOD | Biochemical Oxygen Demand |
| TDS | Total Dissolved Solids |
| TOC | Total Organic Carbons |
| TSS | Total Suspended Solids |
| % REM | Percent Removal |

# APPENDIX C

PENNWALT CHEMICAL CORPORATION
CHRONOLOGICAL LISTING OF SAMPLING VIOLATIONS

| Violation number | Monitoring period | Outfall number | Parameter improperly sampled | Required monitoring | Number of violations |
|---|---|---|---|---|---|
| ~~1~~ | ~~11/18/86–2/5/90~~ | 001 | ~~BOD~~ | ~~1/mo~~ | ~~38~~ |
| ~~2~~ | ~~11/18/86–2/5/90~~ | 001 | ~~TOC~~ | ~~1/mo~~ | ~~38~~ |
| ~~3~~ | ~~11/18/86–2/5/90~~ | 001 | ~~TSS~~ | ~~1/wk~~ | ~~166~~ |
| ~~4~~ | ~~11/18/86–2/5/90~~ | 001 | ~~TDS~~ | ~~1/wk~~ | ~~166~~ |
| ~~5~~ | ~~11/18/86–2/5/90~~ | 001 | ~~FLUORIDE~~ | ~~1/wk~~ | ~~166~~ |
| 6 | 2/90 | 001 | pH | 1/day | ~~28~~ 1 |
| 7 | 2/90 | 001 | TEMP | 1/mo | 1 |
| 8 | 2/90 | 001 | OIL & GREASE | 1/mo | 1 |

Total violations ~~604~~ 3

TABLE OF ABBREVIATIONS

| | |
|---|---|
| BOD | Biochemical Oxygen Demand |
| TDS | Total Dissolved Solids |
| TEMP | Temperature |
| TOC | Total Organic Carbons |
| TSS | Total Suspended Solids |

## APPENDIX D
### PENNWALT CHEMICAL CORPORATION
### CHRONOLOGICAL LISTING OF REPORTING VIOLATIONS

| Violation number | Monitoring period | Outfall number | Discharge parameter | Permit limits | Reported result | No violation reported | Actual lab result | Reporting violations |
|---|---|---|---|---|---|---|---|---|
| 1 | 09/85 | 001 | pH Max | 9.0 S.U. | 8.70 S.U. | NV | 10.10 S.U. | 1 |
| 2 | 10/85 | 001 | pH Max | 9.0 S.U. | 9.05 S.U. | | 10.17 S.U. | 2 |
| 3 | 11/85 | 001 | Pb | 0.1 mg/l | 0.10 mg/l | NV | 0.11 mg/l | 1 |
| 4 | 11/85 | 001 | F Max | 100.0 mg/l | 35.40 mg/l | NV | 156.00 mg/l | 1 |
| 5 | 11/85 | 001 | pH MF | DAILY | 30/30 | NV | 29/30 | 1 |
| 6 | 1/86 | 001 | pH Min | 6.0 S.U. | 5.50 S.U. | NV | 5.50 S.U. | 2 |
| 7 | 2/86 | 001 | pH Min | 6.0 S.U. | 6.50 S.U. | NV | 5.80 S.U. | 1 |
| 8 | 4/86 | 001 | Pb | 0.1 mg/l | 0.09 mg/l | NV | 0.91 mg/l | 1 |
| 9 | 5/86 | 001 | pH Min | 6.0 S.U. | 6.80 S.U. | NV | 2.36 S.U. | 1 |
| 10 | 8/86 | 001 | Cu | 0.2 mg/l | 0.20 mg/l | NV | 0.22 mg/l | 1 |
| 11 | 5/87 | 001 | O & G | 10.0 mg/l | 3.50 mg/l | NV | 35.00 mg/l | 1 |
| 12 | 6/87 | 001 | pH MF | DAILY | 31/31 | NV | 28/31 | 1 |
| 13 | 7/87 | 001 | pH MF | DAILY | 31/31 | NV | 27/31 | 1 |
| 14 | 8/87 | 001 | pH MF | DAILY | 31/31 | NV | 27/31 | 1 |
| 15 | 8/87 | 001 | pH Min | 6.0 S.U. | 6.70 S.U. | NV | 5.40 S.U. | 1 |
| 16 | 10/87 | 001 | pH MF | DAILY | 31/31 | NV | 29/31 | 1 |
| 17 | 10/87 | 001 | pH Min | 6.0 S.U. | 6.00 S.U. | NV | 5.80 S.U. | 1 |
| 18 | 11/87 | 001 | pH Min | 6.0 S.U. | 6.90 S.U. | NV | 3.90 S.U. | 1 |
| 19 | 11/87 | 001 | pH Max | 9.0 S.U. | 8.60 S.U. | NV | 10.00 S.U. | 1 |
| 20 | 12/87 | 001 | pH Min | 6.0 S.U. | 6.50 S.U. | NV | 5.10 S.U. | 1 |
| 21 | 12/87 | 001 | pH MF | DAILY | DAILY | NV | 30/31 | 1 |
| 22 | 2/88 | 002 | O & G | 10.0 mg/l | 273.00 mg/l | | 293.00 mg/l | 1 |
| 23 | 7/88 | 001 | pH Max | 9.0 S.U. | 8.70 S.U. | | 10.70 S.U. | 1 |
| 24 | 8/88 | 001 | pH Max | 9.0 S.U. | 8.70 S.U. | | 9.30 S.U. | 1 |
| 25 | 12/88 | 001 | pH Max | 9.0 S.U. | 8.60 S.U. | NV | 9.48 S.U. | 1 |
| 26 | 3/89 | 001 | pH Min | 6.0 S.U. | 6.20 S.U. | NV | 5.60 S.U. | 1 |
| 27 | 9/89 | 001 | Pb | 0.1 mg/l | 0.019 mg/l | NV | 0.42 mg/l | 1 |
| 28 | 10/89 | 001 | Pb | 0.1 mg/l | 0.013 mg/l | NV | 0.18 mg/l | 1 |
| 29 | 11/89 | 001 | F Max | 100.0 mg/l | 105.00 mg/l | | 550.00 mg/l | 1 |
| 30 | 4/90 | 001 | TSS % rem | | | NV | | 1 |

Total number of violations 32 28 27

### TABLE OF ABBREVIATIONS

| | |
|---|---|
| COD | Chemical Oxygen Demand |
| Cu | Copper |
| F | Fluorides |
| kg/day | Kilograms per day |
| MAX | Maximum |
| MF | Monitoring Frequency |
| mg/l | Milligrams per litre |
| Min | Minimum |
| O & G | Oil & Grease |
| Pb | Lead |
| % rem | Percent Removal |
| S.U. | Standard Units |
| TSS | Total Suspended Solids |